INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL UN-
ION NO. 53, AFL–CIO, Appellant,

v.

SHO–ME POWER CORPORATION,
Appellee.

No. 82–2007.

United States Court of Appeals,
Eighth Circuit.

Submitted April 15, 1983.

Decided Sept. 2, 1983.

Marsha J. Murphy, Scott A. Raisher, Jol-
ley, Moran, Walsh, Hager & Gordon, Kansas
City, Mo., for appellant.

Craig S. Johnson, Stockard, Andereck,
Hauck, Sharp & Evans, Jefferson City, Mo.,
for appellee.

Before BRIGHT and FAGG, Circuit
Judges, and REGAN, Senior District
Judge.*

BRIGHT, Circuit Judge.

The International Brotherhood of Electri-
cal Workers, Local 53 (Union) appeals from
the district court's judgment which refused

* JOHN K. REGAN, United States Senior District
Judge for the Eastern District of Missouri, sit-
ting by designation.

to enforce an arbitrator's award ordering the Sho-Me Power Corporation (Utility) to reinstate without backpay a Union member, Stephen Thornton, to his former job with the Utility. The district court ruled that the arbitrator's award failed to draw its essence from the collective bargaining agreement between the Utility and the Union, and, therefore, granted the Utility's motion for summary judgment. We reverse and remand.

## I. *Background.*

Stephen Thornton worked for the Utility as an equipment operator-truck driver. During the weekend of June 5, 1981, Thornton's foreman advised Thornton that for the following week he had been assigned to work out of town with a crew at the Utility's substation in Gainesville, Missouri. The foreman told Thornton that the Utility would house the crew at the Theodoshia Marina and Resort (Resort) at Theodoshia, Missouri, but that Thornton would be responsible for his family's accommodations.

On June 8, Thornton and the other members of the Utility's work crew checked in at the Resort. The Resort's owner informed Thornton that he would be charged extra if his family wished to stay at the Resort. Thornton's family arrived at the Resort on June 9 and stayed through June 11. On several occasions during the week Thornton attempted to persuade the Resort's owner to waive the additional charges for Thornton's family or to include the additional charges in the Utility's bill. After several requests, the Resort's owner agreed to reduce the additional charges for Thornton's family.

Six weeks later, on June 21, the Utility discharged Thornton. The Utility's general manager explained the Utility's reasons for firing Thornton in a letter given to Thornton on the same day:

It has come to my attention that while on Sho-Me business, you and your family stayed at the Cook's Marina at Theodoshia, Missouri. You were advised by your Supervisor, Lesley Trantham, that no special compensation from Sho-Me in the manner of lodging expense would be allowed for your family. After being denied compensation for your family and during that stay you attempted to coerce the owners into increasing the nightly lodging rate paid by Sho-Me to cover the added cost of your family.

The owners refused your repeated efforts and have advised me that you are no longer welcome at their facilities either as a private guest of the motel or when you are on Sho-Me's business at the company's expense.

Mr. Charles Brown, the Ozark County Prosecutor has advised me that your alleged actions are considered "attempted stealing by deceit" which according to the criminal statutes of Missouri is a class "C" misdemeanor punishable by a maximum fine of $300 and 15 days in jail.

Based on your actions, you are hereby advised that you are immediately terminated. Please contact the Director of Personnel to arrange the final settlement of the Sho-Me employment Benefit program.

During the six week interval between Thornton's stay at the resort and his termination, the Utility did not question Thornton or any of his co-workers about the incident. At the time, the Union and the Utility were engaged in difficult contract negotiations. At a Union meeting on July 2, the bargaining unit voted to reject the Utility's proposed contract. Although the Union requested its International Union to sanction a strike, the negotiations continued. Finally, on July 20, the bargaining unit voted at another meeting to ratify the Utility's second proposed contract.

At both of these meetings, Thornton attacked the Utility's proposals. In fact, the arbitrator found that "[o]ther employees spoke against ratification of the Agreement at both meetings but not as strongly as did [Thornton]." He spoke of engaging in sit-ins and "blue flu" work stoppages. The day after the Union voted to ratify the

Utility's second proposal, July 21, the Utility discharged Thornton.

Three days later, the Utility's general manager met with the Union's business manager concerning Thornton's discharge. The business manager asked the general manager why the Utility had waited so long before discharging Thornton. The general manager stated that the Utility waited because it had wanted to give the matter serious consideration, and, also, because of the contract negotiations. The general manager specifically referred to Thornton's remarks at the Union's meeting concerning "blue flu" work stoppages.

Subsequently, the Union and Thornton filed a grievance. Thereafter, the parties submitted the matter to arbitration. After conducting a hearing, the arbitrator stated:

> In this case we have the imposition of discharge six weeks after the occurrence, but at the first opportunity after Management had the Collective Bargaining Agreement ratified by the Union over Grievant's vocal opposition. We have the General Manager's statements to the Union representatives made within days of the discharge concerning Grievant's verbalization at the Union meeting. These factors, juxtaposed with each other, lead the Arbitrator to the conclusion and the holding that Grievants' [sic] discharge was motivated in substantial part and impelled by his union activities. Indeed, that conclusion, in the circumstances of this case, seems inescapable.

> Having concluded that Grievant's conduct of June 8, 9 and 10 amounted to serious dishonesty which, if standing alone, would justify his summary discharge, but that the motivating factor, at least in substantial part, which impelled management to the decision to discharge him was his union activities, the Arbitrator finds that Grievant's discharge was not proper under the Parties' Agreement.

> Grievant is deserving of serious discipline in this case. But the discharge itself cannot stand because of the General Manager's improper—indeed, unlawful—motivation involving Grievant's activities. * * * Grievant will therefore be reinstated without any provision for back pay.

Because the Utility refused to comply with the arbitrator's award, the Union sought enforcement in the district court.

At the outset, the district court determined that the parties had agreed to submit their dispute to arbitration and that the arbitrator had acted within the scope of his authority in interpreting various terms under the collective bargaining agreement. The court, however, went on to conclude that the arbitrator's award failed to draw its essence from the collective bargaining agreement. The district court reasoned:

> Although the arbitrator had interpreted the collective bargaining agreement to prohibit only unreasonable, arbitrary, or capricious Management *action,* the arbitrator ultimately based his award upon his perception of the *motivation* underlying management action which was acceptable in all other respects. The arbitrator previously had not interpreted the collective bargaining agreement to impose such a restriction, and frankly admitted that his award was based solely upon his own interpretation of desirable social policy. Thus, the arbitrator reasoned that "[t]o allow the discharge to stand would result, in the Arbitor's judgment, in too chilling an effect upon the free exercise of the fundamental right of Grievant and each of his fellow employees to engage in concerted activities and to bargain collectively with the Employer."

Consequently, the court granted the Utility's motion for summary judgment and denied enforcement of the arbitrator's award. This appeal followed.

II. *Discussion.*

██ The Supreme Court enunciated the general principles governing judicial review in three seminal cases which have come to be known as the "Steelworkers

Triology." *United Steelworkers of America v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). A reviewing court must uphold an arbitrator's award so long as it "draws its essence" from the collective bargaining agreement. *United Steelworkers of America v. Enterprise Wheel & Car Corp., supra,* 363 U.S. at 596–97, 80 S.Ct. at 1360–61; *Lackawanna Leather Co. v. United Food & Commercial Workers International Union, AFL–CIO & CLC,* 706 F.2d 228 (8th Cir.1983) (*en banc*). If the award does not draw its essence from the contract, the reviewing court must vacate or modify the award.[1] Reviewing courts, however, will broadly construe the collective bargaining agreement's grant of power to the arbitrator. *Resilient Floor and Decorative Covering Workers, Local Union 1179 v. Welco Manufacturing Co.,* 542 F.2d 1029, 1032 (8th Cir.1976). Moreover, it is not within the courts' scope of review to judge the merits of a grievance. *Kewanee Machinery Division v. Local Union No. 21, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 593 F.2d 314, 317 (8th Cir.1979).

The Union contends the district court erred in ruling that the arbitrator's award failed to draw its essence from the collective bargaining agreement.[2] We agree.

Our starting point is the collective bargaining agreement between the Utility and the Union. The agreement provides, in pertinent part:

Article I, Section 2.

The Union recognizes that Management of the Corporation, the direction of its working forces, the determination of the number of men it will employ or retain, the right to hire, discharge, promote, demote, transfer, and release employees is vested in and reserved by the Corporation, subject, however, to the provisions of this Agreement.

\* \* \* \* \* \*

Article V, step 4.C.

All decisions rendered by the Arbitration Board shall be final and binding upon both parties. \* \* \* In no event shall this board have the authority to amend or change any of the provisions of this agreement.

\* \* \* \* \* \*

Article VI, Seniority, Section 1.

Seniority is a right accruing to employees as a result of length of service with the Corporation which entitles them to preference, qualifications and ability being equal, to retention in service, \* \* \* providing the employee is able to perform the required duties.

\* \* \* \* \* \*

---

1. The Supreme Court has stated:

[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award. [*United Steelworkers of America v. Enterprise Wheel & Car Corp., supra,* 363 U.S. at 597, 80 S.Ct. at 1361.]

2. We note that the Utility contends the district court erred in sustaining the arbitrator's interpretation of the term, "discharge for cause," contained in the collective bargaining agreement. We reject this contention. An arbitrator may interpret, construe or apply the provisions of a collective bargaining agreement if the contract does not limit his authority to do so. *Vulcan-Hart Corp. v. Stove, Furnace, & Allied Appliance Workers International Union, Local 110,* 671 F.2d 1182 (8th Cir.1982). Here, the agreement does not limit the arbitrator's authority to interpret, construe or apply the agreement. As we discuss, *infra,* the arbitrator acted within his authority in interpreting the collective bargaining agreement and his award drew its essence therefrom. Accordingly, the award should be enforced.

Article VI, Section 5.

Seniority shall be lost by the occurrence of any of the following:

\* \* \* \* \* \*

b. Discharge for cause \* \* \*.

■ The collective bargaining agreement empowers the arbitrator to determine whether the Utility's discharge of Thornton was "for cause." In his award, the arbitrator concluded, "[Thornton's] discharge was not proper under the Contract between the [Utility] and the Union." We conclude the arbitrator's award draws its essence from the collective bargaining agreement.

The arbitrator's award is based on his interpretation of the collective bargaining agreement's "discharge for cause" provision. The arbitrator considered this phrase, the parties' arguments and the witnesses' testimony, and concluded that the Utility's discharge of Thornton did not meet the collective bargaining agreement's standards for cause. The arbitrator, by necessity, had to give meaning to the collective bargaining agreement's "discharge for cause" provision. The meaning of this term is not apparent on its face. Interpreting this standard merely as requiring that the Utility have some "cause" for discharging an employee, renders it superfluous; unless the Utility randomly discharges its employees, it will always have some "cause" as a reason for its discharge of an employee. The arbitrator considered the "discharge for cause" provision in the context of the collective bargaining agreement as a restriction on the generally unfettered right of an employer to discharge its employees.

■ The arbitrator interpreted "cause" as synonymous with "just or reasonable cause" and determined that these terms imposed on management an obligation to refrain from unreasonable, arbitrary, or capricious actions. The district court did not dispute the arbitrator's interpretation and neither will we. As the district court properly noted, courts cannot interfere with an arbitrator's interpretation "unless it can be

said with positive assurance that the contract is not susceptible of the arbitrator's interpretation." *Quoting, Kewanee Machinery Division v. Local Union No. 21, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, supra,* 593 F.2d at 318. The Utility has not pointed to, nor do we find, any evidence which gives us positive assurance that the agreement was not susceptible to the arbitrator's finding that the collective bargaining agreement required "just cause" before the Utility could discharge an employee.

The arbitrator found Thornton guilty of dishonesty serious enough to merit discharge. The arbitrator concluded, however, that the Utility discharged Thornton because of his protected union activities. Consequently, the arbitrator found Thornton's discharge to have been improper under the collective bargaining agreement and directed the Utility to reinstate him without backpay.[3] It is unimportant whether we agree with the arbitrator's interpretation of the collective bargaining agreement. "It is the arbitrator's construction which was bargained for, and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *United States Steelworkers of America v. Enterprise Wheel & Car Corp., supra,* 363 U.S. at 599, 80 S.Ct. at 1362. *See also, Lackawanna Leather Co. v. United Food & Commercial Workers International Union, AFL–CIO & CLC, supra,* 706 F.2d at 231–32; *cf. United Electrical, Radio and Machine Workers of America, Local 119 v. Litton Microwave Cooking Products, Litton Systems, Inc.,* 704 F.2d 393 (8th Cir.1983), *rehearing en banc granted.* The arbitrator's award in this case draws its essence from the collective bargaining agreement and, accordingly, should be enforced.

III. *Conclusion.*

For the reasons stated in this opinion, the judgment of the district court is reversed.

---

**3.** The Union has not challenged the arbitrator's denial of backpay.

We remand with directions that the district court grant summary judgment in favor of the Union and order enforcement of the arbitration award.