**CENTRALAB, INC., FORT DODGE, IOWA, Appellee,**

v.

**LOCAL NO. 816, INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA, Appellant.**

No. 86–2091.

United States Court of Appeals, Eighth Circuit.

Submitted May 15, 1987.

Decided Sept. 1, 1987.

Dennis M. McElwain, Sioux City, Iowa, for appellant.

Claire F. Carlson, Fort Dodge, Iowa, for appellee.

Before LAY, Chief Judge, TIMBERS,[*] Senior Circuit Judge, and MAGILL, Circuit Judge.

MAGILL, Circuit Judge.

Local No. 816, International Union of Electrical, Radio and Machine Workers of America, AFL–CIO (the "Union"), appeals from the district court's[1] order granting in part Centralab, Inc.'s ("Centralab") motion for summary judgment. The district court upheld that part of an arbitrator's award finding that Centralab's new time standards for incentive pay were improper, but vacated that part of the arbitrator's award setting new rates and ordering retroactive pay adjustments. For the reasons discussed below, we affirm.

## I. BACKGROUND.

The facts in this case are not in dispute. Centralab, the employer, operates a plant at Fort Dodge, Iowa, where it manufactures electrical switches. The Union represents production and maintenance employees at the plant. Centralab and the Union are parties to a collective bargaining agreement governing the terms and conditions of employment, and providing for final and binding arbitration of grievances.

The dispute in this case arose under a provision of the agreement dealing with incentive pay. Article V, Section 6 of the agreement provides for an employee incentive plan, with incentive pay for increased productivity. The stated objective of the plan is:

> to provide an opportunity for the normal, skilled, efficient operators, using the proper method, to earn one hundred twenty-five (125) percent of the base wage when applying one hundred twenty-five (125) percent effort on incentive jobs on which the operator is experienced. The Company does not guarantee the earnings objective nor is there any limit on incentive earnings.

Paragraphs (a), (b), and (c) of Section 6 govern the development of an appropriate time standard for the incentive jobs.

In March of 1984, Centralab established new time standards for the job involving final assembly and sonic sealing of two spring, non-lighted, momentary switches (Operations 14 2017A and 14 2019A). Operators met these standards during the first several days after they were implemented, and were therefore eligible to re-

---

[*] The HONORABLE WILLIAM H. TIMBERS, Senior Circuit Judge for the United States Court of Appeals for the Second Circuit, sitting by designation.

1. The Honorable David R. Hansen, United States District Judge for the Northern District of Iowa.

ceive incentive pay earnings in excess of 125 percent of their base wage. Thereafter, operators were unable to meet the new standards. The Union, in late March, informed Centralab that it questioned the standards. After unsuccessful attempts to resolve the dispute, the Union filed formal grievances pursuant to the collective bargaining agreement. The Union requested arbitration of the grievances, and on April 11, 1985, an arbitration hearing was held before a duly-selected arbitrator.

During the arbitration hearing, Centralab objected when the Union suggested that the arbitrator fix a different time standard if he determined that the standards set by Centralab were improper. Centralab argued that the arbitrator was without authority to fix a different time standard because Article III, Section 4, paragraph (f) of the collective bargaining agreement limited the arbitrator's authority in a grievance case of this type solely to determining whether the company's rates were in line with Article V. Paragraph (f) provides:

> The arbitrator selected for arbitration of an incentive rate shall be one technically qualified in the subject. *The arbitrator shall limit his decision to whether the rate set by the Employee [sic] may reasonably be expected to yield the earnings provided in Article V.* The impartial arbitrator may review the Company's rate development and determine whether or not it has been established consistent with the terms of the agreement and with the methods used by the Company in establishing production standards. [Emphasis supplied.]

Also during the hearing, Centralab invited the arbitrator to do an on-site inspection to determine whether the "rates in question, the employees in question or some other mysterious hidden factor is responsible for this grievance." The arbitrator did so, and further, with a stopwatch in hand, conducted his own time study of the operations.

Based on the testimony and exhibits entered at the hearing, and on his own time study analysis of the operations in question, the arbitrator found and awarded that Centralab's new time standards for Operations 14 2017A and 14 2019A did not provide operators with an opportunity to earn incentive pay in line with Article V of the agreement. As a further part of his award, the arbitrator set and ordered into effect his own time standards.

In his accompanying opinion, the arbitrator specifically addressed Centralab's objection to his authority to set new rates by stating that he did not interpret Article III, Section 4, paragraph (f) "to limit his authority to order a remedy." He reasoned that Centralab's interpretation of the agreement would deny the parties finality in the resolution of their disputes. The arbitrator further stated that Article III, Section 5, which provides for retroactive adjustment of rates in the event of a grievance,[2] supported his conclusion that he had authority to set new rates. Centralab subsequently brought suit to set aside the award.[3]

Ruling upon cross-motions for summary judgment, the district court upheld part and vacated part of the arbitrator's award. The court determined that the agreement authorized the arbitrator to determine whether Centralab's new standards were improper, and therefore upheld that part of the arbitrator's award finding that Centralab's standards did not allow operators to achieve incentive pay earnings in line with Article V of the agreement. The court further determined that the agreement did not authorize the arbitrator to set new standards, and thus vacated that part of the arbitrator's award, reasoning as follows:

> In this case the parties clearly agreed that in the arbitration of an incentive rate question the authority of the arbitrator was strictly limited to determining

---

2. Article III, Section 5 provides: "When rates or evaluations are adjusted during any steps of this procedure as a result of a grievance, the adjustment shall be effective from the date the grievance was first presented in writing to the Company."

3. Centralab originally brought suit in state court. Pursuant to the Union's motion, the case was removed to federal court.

"whether the rate set by the Employee [sic] may reasonably be expected to yield the earnings provided for" in the incentive provisions. Had the parties intended to vest the arbitrator with the power to make the determination of what precise rate was correct, they would not have agreed to such a limitation upon the arbitrator in the agreement. When the arbitrator in this case decided *the* rate to be used, he decided something the parties had not agreed to let him decide and he exceeded his grant of authority as contained in the contract.

The arbitrator claimed implied authority to determine what rate was correct from Section 5 of Article III. No such authority can be there found. While the *parties themselves* may be able to "adjust" rates by separate agreement during the grievance resolution procedures, and Section 5 of Article III would then determine the effective date of such agreed upon adjustments, the language of Section 5 does nothing to empower anyone (let alone the arbitrator) to "adjust" anything. Section 5 merely establishes the effective date of any adjustments made during the grievance resolution procedure. The power to make those "adjustments" must emanate from an independent agreement between the parties to do so or from some other source in the collective bargaining agreement.

By expressly disregarding the clear contractual limit on his authority in incentive rate questions as expressed in the agreement, the arbitrator went beyond his powers and that part of his award which sets the rate does not "draw its essence from the collective bargaining agreement." [Emphasis supplied by district court.]

This appeal followed.

## II. DISCUSSION.

The Union contends that the district court erred in vacating that portion of the arbitrator's award setting new time standards. Specifically, the Union argues that the district court applied an erroneous standard of review in holding that the arbitrator exceeded his contractual authority. The Union maintains that by framing the issue before it as one of arbitrability, the court was able to decide for itself the question of the arbitrator's authority, in disregard of the strong precedents requiring courts to give great deference to both an arbitrator's interpretation of his own authority and an arbitrator's remedial powers. Under the facts of this case, we do not believe the district court erred in vacating the remedial portion of the arbitrator's award.

The district court began its analysis by noting that the question of an arbitrator's authority requires an examination of the parties' collective bargaining agreement since the arbitrator can possess only that power the parties have agreed to give him. More specifically, as evidenced by its quoting the following passage from *AT & T Technologies, Inc. v. Communications Workers of America,* 106 S.Ct. 1415, 475 U.S. 643, 89 L.Ed.2d 648 (1986), the district court expressed its belief that the precise issue before it was whether the parties had agreed to submit the matter of setting new time standards to arbitration:

The first principle gleaned from the *Trilogy* is that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." [*United Steelworkers of America v.*] *Warrior & Gulf* [*Navigation Co.,* 363 U.S. 574, 582, [80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409] (1960);] [*United Steelworkers of America v.*] *American Mfg. Co.,* [363 U.S. 564, 570–71 (1960)] (Brennan, J., concurring). This axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration. *Gateway Coal Co. v. Mine Workers,* 414 U.S. 368, 374 [94 S.Ct. 629, 635, 38 L.Ed.2d 583] (1974).

*Id.* at 1418.

In quoting further from *AT & T,* the district court implicitly stated that it felt the issue before it was essentially a question of arbitrability:

The second rule, which follows inexorably from the first, is that the question of

arbitrability—whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator. *Warrior & Gulf, supra,* 363 U.S., at 582–583 [80 S.Ct. at 1353]. [Further citations omitted.]

*Id.* at 1418–19.

The district court then analyzed the relevant arbitration provisions of the parties' agreement, which led it to conclude that the arbitrator exceeded his contractual authority in setting new time standards. The court therefore held that that part of the arbitrator's award did not draw its essence from the collective bargaining agreement. *See United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960).

■ Contrary to the Union's contention, we do not believe the district court applied an erroneous standard of review. Nor do we believe that the court erred in concluding that the arbitrator exceeded his authority in setting his own time standards. Indeed, the district court analyzed the issue of the arbitrator's authority in the same manner as this court did in two cases involving the same issue and strikingly similar facts.

In both *St. Louis Theatrical Co. v. St. Louis Theatrical Brotherhood Local 6,* 715 F.2d 405 (8th Cir.1983), and *Truck Drivers & Helpers Union Local 784 v. Ulry-Talbert Co.,* 330 F.2d 562 (8th Cir. 1964), an employee's discharge eventually wound up in arbitration. In both cases, the arbitrators issued awards finding the employees guilty of the conduct resulting in their discharges, but concluded that discharge was too severe a punishment. The arbitrators therefore awarded the employees the remedy of reinstatement, and in the case of *Theatrical Brotherhood,* with backpay. The employers subsequently challenged the remedial portions of the arbitrators' awards as being in excess of their contractual authority. In both cases, the district court agreed with this contention and vacated the remedial portions of the arbitrators' awards. *See Theatrical Brotherhood,* 715 F.2d at 407; *Truck Drivers,* 330 F.2d at 563.

On appeal to this court, we reviewed the issue as one of whether the arbitrator exceeded his contractual authority. *See Theatrical Brotherhood,* 715 F.2d at 407, 408; *Truck Drivers,* 330 F.2d at 563. In *Theatrical Brotherhood,* we explicitly suggested that the issue was one of arbitrability. *See Theatrical Brotherhood,* 715 F.2d at 408 ("the collective bargaining agreement provides that the *only arbitrable issue * * *"*). In both cases, we examined the relevant collective bargaining provisions governing the arbitrator's authority in the type of grievances involved. *See id.* at 407–08; *Truck Drivers,* 330 F.2d at 563–65. After analyzing the provisions, we concluded that they were very narrowly drawn and did not give the arbitrators the authority to issue any remedy for the employees' violative conduct, and we therefore held that the arbitrators exceeded their contractual authority in awarding reinstatement. *See Theatrical Brotherhood,* 715 F.2d at 408; *Truck Drivers,* 330 F.2d at 564–65.

As can be seen, the district court here, like this court in the above two cases, complied with Supreme Court precedent and limited its judicial inquiry to whether the parties agreed "to give the arbitrator the power to make the award he made." *Warrior & Gulf,* 363 U.S. at 582, 80 S.Ct. at 1353; *see Truck Drivers,* 330 F.2d at 566. Moreover, it is readily apparent that the district court framed and analyzed the issue in precisely the same manner as this court did in both *Theatrical Brotherhood* and *Truck Drivers.* To be sure, in neither case did we expressly state that the issue was one of arbitrability so that it was "undeniably an issue for judicial determination," nor could we have stated exactly as such; *AT & T,* the case which specifically used this language in discussing these well-established principles of arbitrability emanating from the *Steelworkers Trilogy,* was not decided until 1986. Nevertheless, this does not take away from the fact that in reality, we followed these well-settled principles in both *Theatrical Brotherhood* and

*Truck Drivers;* this court examined the relevant agreement provisions to determine whether the arbitrator exceeded his authority, despite the arbitrators obviously having a different interpretation of their authority under the respective agreements.

■ What these cases show is that, under certain circumstances, a court does not necessarily ignore an arbitrator's power to interpret the collective bargaining agreement when it determines that the arbitrator exceeded his contractual authority. In fact, in *Theatrical Brotherhood,* we expressly noted that our decision did not depart from this well-settled principle, *Theatrical Brotherhood,* 715 F.2d at 408, but that the case before us was substantially different from the many cases decided by this court upholding arbitrator's awards. *Id.* (citing and discussing *International Brotherhood of Electrical Workers, Local Union No. 53, AFL–CIO v. Sho-Me Power Corp.,* 715 F.2d 1322 (8th Cir.1983), *cert. denied,* 465 U.S. 1023, 104 S.Ct. 1277, 79 L.Ed.2d 682 (1984); *Lackawanna Leather Co. v. United Food & Commercial Workers International Union, AFL–CIO & CLC,* 706 F.2d 228 (8th Cir.1983) (en banc)). Specifically, we explained:

> In the instant case, the arbitrator's award is not the result of his interpretation of the agreement within the context of a specific set of facts. *Nowhere does the agreement give the arbitrator the authority* to determine the fairness or equity of the company's discipline of employees who engage in work stoppages or other prohibitive activities. *Moreover, there are no tensions between sections inherent in the agreement and no ambiguities within the sections. The agreement is not susceptible to any construction beyond its plain meaning.*

*Id.* at 409 (emphasis added).

In other words, we distinguished *Theatrical Brotherhood* from these other cases on the basis that the arbitration clause in *Theatrical Brotherhood* was totally unambiguous and mandated only one conclusion. Although there is a general presumption of arbitrability once an arbitration clause is found to exist, *see AT & T,* 106 S.Ct. at 1419, under circumstances, such as in *Theatrical Brotherhood,* where the clause is unambiguous in its limitation of the arbitrator's authority, " 'it may be said with *positive assurance* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " *Id.* (quoting *Warrior & Gulf,* 363 U.S. at 582–83, 80 S.Ct. at 1353) (emphasis added); *see Kewanee Machinery Division v. Local Union No. 21, International Brotherhood of Teamsters,* 593 F.2d 314, 318 (8th Cir. 1979). Thus, although the presumption of arbitrability "is particularly applicable where the clause is broad," *AT & T,* 106 S.Ct. at 1419, where, as in *Theatrical Brotherhood,* the clause is narrowly drawn, *see Theatrical Brotherhood,* 715 F.2d at 408, the presumption necessarily does not have as great a force.

Indeed, in line with these general principles, what *Theatrical Brotherhood* implicitly recognized, and what our review of the relevant authority confirms, is that in virtually every case upholding an arbitrator's award based on the well-settled principle of judicial deference to the arbitrator's interpretation of the collective bargaining agreement, there was, at the least, some ambiguity in the contractual provisions in question or in the arbitrator's award. *See, e.g., W.R. Grace & Co. v. Local Union 759, International Union of Rubber Workers,* 461 U.S. 757, 763, 765–66, 103 S.Ct. 2177, 2181, 2182–83, 76 L.Ed.2d 298 (1983); *Enterprise Wheel,* 363 U.S. at 597–98, 80 S.Ct. at 1361; *Sho-Me Power,* 715 F.2d at 1326; *Lackawanna Leather,* 706 F.2d at 230–31. What the parties' agreements in all of these cases failed to do was to "clearly and unmistakably provide" that the issue was one not subject to arbitration. *AT & T,* 106 S.Ct. at 1418. Under these circumstances, to allow a reviewing court to substitute its interpretation of the agreement for that of the arbitrator would clearly contravene the basic principles underlying arbitration. As best expressed by the Supreme Court in *Enterprise Wheel:*

> The acceptance of this view would require courts, even under the standard arbitration clause, to review the merits of every construction of the contract. This plenary review by a court of the merits would make meaningless the pro-

visions that the arbitrator's decision is final, for in reality it would almost never be final. This underlines the fundamental error which we have alluded to in *United Steelworkers of America v. American Manufacturing Co., ante,* 363 U.S. p. 564, 80 S.Ct. 1343, decided this day. As we there emphasized, the question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

*Enterprise Wheel,* 363 U.S. at 598–99, 80 S.Ct. at 1361.

In this case, however, the arbitration clause covering incentive rate disputes, like the relevant arbitration clauses in both *Theatrical Brotherhood* and *Truck Drivers,* "clearly and unmistakably" limits the arbitrator's authority. Article III, Section 4, paragraph (f) specifically states that the "arbitrator *shall limit his decision* to whether the rate set by the Employee [sic] may reasonably be expected to yield the earnings provided in Article V." [Emphasis added.] This particular arbitration clause, like the relevant provisions in *Theatrical Brotherhood* and *Truck Drivers,* is narrowly drawn and essentially requires a "yes" or "no" answer. In fact, it is difficult to distinguish the explicit limiting language in this case from that in both of the aforementioned cases. *See Theatrical Brotherhood,* 715 F.2d at 408 ("Any employee violating this provision may be disciplined or discharged *and shall have no recourse* to any other provision of this Agreement *except as to the fact of participation.*"); *Truck Drivers,* 330 F.2d at 564 ("the arbitration board *shall not substitute its judgment for that of management and shall only reverse the action or decision of management if* it finds \* \* \* ").

Furthermore, nowhere in the agreement did the parties give the arbitrator power to set new rates. Paragraph (f) only provides that the arbitrator "may review" the Company's rate development; it does not give the arbitrator any power to set new rates.

In fact, Centralab did not invite the arbitrator onto its premises to conduct a time study *to be used in setting new rates;* he did this on his own. The company invited him onto the premises solely to determine what was responsible for the grievance. Additionally, although the arbitrator felt that Section 5 of the agreement gave him authority to set new rates, there is nothing in that section, as recognized by the district court, which could even remotely be construed to authorize this power. Indeed, there are no tensions or ambiguities in these provisions; thus, it can be said "with positive assurance" that the contract is not susceptible of the arbitrator's claimed interpretation. *See AT & T,* 106 S.Ct. at 1419; *Kewanee Machinery,* 593 F.2d at 318. Accordingly, we hold that the district court properly vacated the arbitrator's award based on its determination that the arbitrator exceeded his contractual authority.

Even if, however, an ambiguity did exist, this does not necessarily mean that the district court erred in vacating the arbitrator's award. In *Enterprise Wheel,* where an ambiguity existed in the arbitrator's opinion, the Court still made it abundantly clear that there would be circumstances where an arbitrator's award would not be entitled to judicial enforcement:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; *he does not sit to dispense his own brand of industrial justice.* He may of course look for guidance from many sources *yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement.* When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Enterprise Wheel,* 363 U.S. at 597, 80 S.Ct. at 1361.

■ In *Enterprise Wheel,* although the ambiguity did not preclude enforcement of the remedial portion of the arbitrator's award, the Court explicitly suggested that the arbitrator's award would not have been entitled to judicial enforcement if the Court

had found that the arbitrator had "not stayed within the areas marked out for his consideration" or had gone "beyond the submission." *Id.* at 598, 80 S.Ct. at 1361. What the Court clearly implied, in view of its previous discussion of the limits on the arbitrator's authority, is that where an arbitrator goes beyond his contractual authority to decide issues not properly before him, his award fails to draw its essence from the agreement and must be vacated, despite the usual great deference given to arbitrator's awards. Indeed, that is precisely what this court held in *Theatrical Brotherhood. Theatrical Brotherhood,* 715 F.2d at 409; *see also Truck Drivers,* 330 F.2d at 564–66; *Kansas City Luggage & Novelty Workers Union v. Neevel Luggage Mfg. Co.,* 325 F.2d 992, 994 (8th Cir. 1964).

Even under this standard of review, it is apparent that the district court did not err in vacating the arbitrator's award. By deciding *the* "correct" rate to be used for the affected operations, the arbitrator decided an issue which the arbitration provisions did not give him authority to decide. Thus, the district court followed established precedent and correctly held that the part of the arbitrator's award setting new rates did not draw its essence from the agreement.

Finally, contrary to the Union's second specific problem with the district court's decision, just because the court's holding resulted in its vacating the remedial portion of the arbitrator's award does not inevitably lead to the conclusion that the district court ignored strong precedent requiring courts to give great deference to the arbitrator's remedial powers. *See, e.g., Enterprise Wheel,* 363 U.S. at 597, 80 S.Ct. at 1361.

Rather, where as here, a court concludes that the arbitrator did not stay within the bounds of his authority, this principle of deference inevitably gives way, as recognized by the Supreme Court in *Enterprise Wheel,* to the greater principle that an award not drawing its essence from the agreement is not entitled to judicial enforcement. Indeed, this court implicitly recognized the inevitability of this result in *Theatrical Brotherhood, Truck Drivers,* and *Kansas City Luggage,* where, like the district court here, we vacated only the remedial portion of the arbitrators' awards as being in excess of their contractual authority. In sum, simply because it is the remedy portion of the award that fails to draw its essence from the agreement is no reason to place the issue of an arbitrator's authority beyond the powers of a reviewing court.

### III.  CONCLUSION.

In conclusion, we hold that the district court did not err in vacating the remedial portion of the arbitrator's award as being in excess of his contractual authority. Accordingly, we affirm.

LAY, Chief Judge, dissenting.

I respectfully dissent.

In the instant case, Article III of the collective bargaining agreement addresses grievance procedures. The Court quotes section 4, paragraph (f) of that Article and holds that although the arbitrator has the authority to hear incentive rate disputes, all that he may do is determine their reasonableness, apparently leaving to the company the duty to correct any unreasonable incentive rate.

Article V, section 6 of the agreement discusses the implementation of the incentive plan. At section 6(g), the agreement prescribes the process to change incentive standards: "Incentive standards will *not* be changed except to the extent that equipment, tools, materials, methods, layout, etc., are changed and affect the time standard for the job." (Emphasis added). This section makes no provision for the company to change the incentive standard as a result of a grievance. Thus, if the majority's reading of the agreement were correct, then the arbitrator could not change the incentive standard and the company would not have to do so either. Such a reading of the agreement would necessarily leave the grieving party without a remedy, even though the arbitrator determined the grievance to be meritorious.

However, a closer reading of the agreement demonstrates that such an anomalous

result is unnecessary. Article III, section 5 of the collective bargaining agreement indicates that the arbitrator does indeed have the authority to fashion an appropriate remedy. Section 5 provides: "When rates or evaluations are adjusted during any steps of this procedure *as a result of a grievance,* the adjustment shall be effective from the date the grievance was first presented in writing to the Company." (Emphasis added). When that section is read in conjunction with the prescribed methods of changing incentive standards, there can be little doubt of the existence of the arbitrator's power to grant the relief which he did in this instance.

Such a reading of the agreement is more closely aligned with the Supreme Court's pronouncement of an arbitrator's duties:

When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. *This is especially true when it comes to for-mulating remedies.* There the need is for flexibility in meeting a wide variety of situations.

*United Steelworkers of Am. v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960) (emphasis added).

In *United Elec., Radio and Mach. Workers of Am. v. Litton Microwave Cooking Prods., Litton Sys., Inc.,* 728 F.2d 970 (8th Cir.1984) this court sitting en banc reversed the panel decision and adopted the reasoning and substance of Judge Arnold's dissent. *Id.* at 972. The adoption of that dissent demonstrated this court's recognition of the arbitrator's role:

I am not sure I should have awarded this particular kind of relief, or indeed that the arbitrator was correct in interpreting the contract. But those questions are, in all but the clearest cases, the arbitrator's business, not ours. Moreover, we are admonished to be particularly deferential when reviewing an arbitrator's remedy.

When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem.

This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency.

*United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). * * *

The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment.... The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed.

*United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960). In view of the Supreme Court's clear command that we defer to an arbitrator's judgment, and especially to his remedy, I would enforce the arbitrator's award in its entirety.

*United Elec., Radio and Mach. Workers of Am. v. Litton Microwave Cooking Prods., Litton Sys. Inc.,* 704 F.2d 393, 401 (8th Cir.1983) (Arnold, J. dissenting), vacated, 728 F.2d 970 (8th Cir.1984) (en banc) (adopting panel dissent by J. Arnold in 704 F.2d 393).

Our court has also clearly set forth the guidelines for judicial review of an arbitrator's finding and awards:

[T]he decision of an arbitrator will not be questioned by the courts as long as the arbitrator has acted within the scope of his authority as defined in a duly negotiated collective bargaining agreement. In determining whether an arbitrator has exceeded his authority, the agreement must be broadly construed with all doubts being resolved in favor of the arbitrator's authority. This approach reflects the strong national labor policy

favoring arbitration as set forth by the Supreme Court in what has become known as the Steelworkers Trilogy. *Resilient Floor and Decorative Covering Workers, Local Union 1179 v. Welco Mfg. Co., Inc.,* 542 F.2d 1029, 1032 (8th Cir.1976) (citations omitted).

Applying the role of the arbitrator and appropriate judicial review to the instant case clearly demonstrates that the arbitrator acted within his authority in fashioning the remedy he did.