In the Matter of the ARBITRATION BETWEEN INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS A.F.L. & C.L.C. AND ITS LOCAL 1593, Petitioner,

and

DAKOTA GASIFICATION COMPANY, Respondent.

No. A1–04–137.

United States District Court, D. North Dakota, Southwestern Division.

March 10, 2005.

Patrick A. Donovan, Hazen, ND, for Petitioner.

John J. Mcgirl, Jr., Doherty Law Firm, Dominic J. Cecere, Leonard, Street and Deinard Minneapolis, MN, for Respondent.

## ORDER OF CONFIRMATION OF ARBITRATION AWARD

HOVLAND, Chief Judge.

Before the Court is the Petitioner's Motion to Confirm Arbitration Award filed on November 29, 2004. On December 27, 2004, the Respondent filed a Motion for Summary Judgment and a Counterclaim to Vacate, in part, the Arbitration Award. For the following reasons, the Court confirms the award.

## I. BACKGROUND

The respondent, Dakota Gasification Company ("Dakota Gasification"), is a subsidiary of Basin Electric Power Cooperative of Bismarck, North Dakota. Dakota Gasification owns and operates the Great Plains Synfuels Plant which is located five miles northwest of Beulah, North Dakota, where it employs over 700 employees. Approximately 450 employees, including the field technicians, comprise a bargaining unit which is represented for purposes of collective bargaining by the petitioner I.B.E.W., Local 1593 (the "Union"). *See* Respondent's Ex. A, p. 2. The current collective bargaining agreement (the "Agreement") between the parties became effective on March 1, 2004. *See* Respondent's Ex. B.

The plant operates twenty-four hours a day, seven days a week. Bargaining unit members are employed in any of five departments: Operations, Maintenance, Inspection, Warehouse, and Chemical Laboratory. Each department has four crews assigned to it (A though D), with each crew working a twelve-hour shift four days a week. There are five pay grades for employees, with the opportunity for advancement as skills are enhanced. *See* Respondent's Ex. A, p. 2.

### A. TRANSFER PROVISIONS

The Agreement contains several provisions which relate to employee transfers. First, the Agreement contains a "Management Rights" provisions which reads in relevant part as follows:

### ARTICLE 2

### MANAGEMENT RIGHTS

SECTION 1.

Except as otherwise provided in this Agreement, Management retains all

rights and functions that it possessed prior to this Agreement.

SECTION 2.

As long as the action of the Company does not violate any provision of this Agreement, Management shall have the right, in its sole discretion, to:

> a) Determine the products and services to be offered, and the *right to plan, direct and control all operations.* . . .

> f) Determine the size of the workforce; the allocation and assignment of work or workers; the quality and quantity of work to be performed; the policies affecting the selection and training of employees; *the right to* hire, recall, *transfer,* promote and lay off *employees;* and the right to suspend or dismiss employees *for just* cause. . . .

> h) Schedule operations, including the right to modify, *change,* lengthen or shorten *work schedules,* to close any facility, for any reason provided any notice required by law is given to employees.

Respondent's Ex. B, pp. 3–4 (emphasis added).

More specifically, Article 10, Section 2 of the Agreement governs temporary transfers and reads as follows:

### ARTICLE 10

### GENERAL WORKING RULES

Section 2.

When an employee is transferred from one unit or shift in the facility, permanent transfers shall be posted for bidding (*pursuant to Article 7; Sections 10 and 11* ), but temporary transfers may be made at the option of the Company in accordance to seniority. A temporary transfer may not exceed six months unless there is a mutual agreement between the Company and the employee, then the six months can be extended. A temporary transfer shall be defined as an emergency or inability of the Company to otherwise fill the job.

Respondent's Ex. B, pp. 18–19 (emphasis added).

Finally, Article 7, referred to by Article 10, Section 2, contains procedures for posting job vacancies:

### ARTICLE 7

### SENIORITY

SECTION 10.

Unless otherwise mutually agreed by the Company and the Union, whenever a vacancy exists or a new job is created which is covered by this Agreement, all employees shall have equal opportunity to bid such job openings. Job postings giving the description of the job, location of the work; and a description of the applicable pay rate will be posted on bulletin boards accessible to all employees under this Agreement. The job will be awarded based on minimum qualifications. In the case of multiple qualified candidates, Company seniority will prevail.

SECTION 11.

The job opening bid list shall be posted for a minimum of seven (7) working days for the signatures of bidders. Employees who at the time are absent during this period due to vacation or sickness or other valid reasons, shall be given the opportunity to bid for the job. It shall be the responsibility of the employee to determine whether there have been any job postings during their absence. The employee must submit a bid within three (3) calendar days for their return to work.

Respondent's Ex. B, pp. 14–15.

### B. *UNDERLYING GRIEVANCES*

From late 2003 through the summer of 2004, four job openings occurred on vari-

ous shifts in the bargaining unit. Dakota Gasification posted notices for the openings to comply with Article 7, Section 10. Each notice contained a description of the job, the location of the work, and the pay rate. No one applied for any of the four vacancies. To compensate, Dakota Gasification permanently transferred the least senior technicians into the vacant positions. This caused four employees to be involuntarily transferred from one shift to another. *See* Respondent's Ex. A, p. 3. As a result, the four transferred individuals [1] grieved the decision to involuntarily transfer them and argued that the vacancy could only be temporarily filled in accordance with Article 10, Section 2. *See* Respondent's Ex. A, p. 3; Respondent's Ex. C.

Article 5 of the Agreement contains a three-step grievance and arbitration procedure. After all three steps have been exhausted, "[i]f the grievance remains unsettled, it may be submitted to arbitration by request in writing ten (10) calendar days after receipt of the Company's decision in Step Three of the grievance procedure." Respondent's Ex. B, pp. 10–11. The Agreement further provides:

> The decision of the arbitrator shall be final and binding on the Company, the Union and any employee(s) involved. An arbitrator shall have authority only to settle grievances arising pursuant to the terms of this contract and may interpret and apply the provisions of this Agreement only to the facts of the particular grievances involved. He/she shall have no power or authority to add to, detract from or in any way alter or modify the provisions of this Agreement, nor shall the same question or issue be

the subject or arbitration more than once.

Respondent's Ex. B, p. 11.

Dakota Gasification denied the grievances and concluded that it had the right to permanently transfer employees under the Agreement after first meeting its job posting obligations. Respondent's Ex. A, p. 5. The grievances remained unsettled and all four were consolidated for arbitration. Respondent's Ex. A, p. 4.

## C. ARBITRATION AWARD

On August 13, 2004, an arbitration hearing was held before Arbitrator Fredric R. Dichter in Beulah, North Dakota. Both parties were given an opportunity to present testimony and evidence. At the close of the proceeding, the parties elected to file briefs. Respondent's Ex. A, p. 1.

The parties were unable to agree upon the exact issue presented. In its post-hearing brief, the Union framed the issue as follows: "Did the employer violate the collective bargaining agreement when it involuntarily transferred employees to permanent positions in differing shifts?" Respondent's Ex. D, p. 1. Whereas, Dakota Gasification stated the issue as follows: "Did the company violate the labor agreement by involuntarily transferring Grievants from one shift or crew to another after no employees signed postings for open positions on those shifts and Grievants were the least senior qualified employees?" Respondent's Ex. E, p. 4. Due to the disagreement among the parties, the Arbitrator was asked to frame the issue. Respondent's Ex. A, p. 1.

On October 12, 2004, the Arbitrator issued the Decision and Award. At the out-

---

1. The four grievants were Jayson Walcker, Lynn Bruce, Dan Thiele, and Shawn Borneman.

set, the Arbitrator presented the issue as follows:

> Did the Employer violate the Agreement when it permanently transferred each of the Grievants to a different shift? If so, what is the appropriate remedy? Did the vacancy notices posted by the Employer violate Article 7, Section 10 of the Agreement? If so what is the appropriate remedy?

*Id.* With respect to the first question, the Arbitrator found that "the Employer [Dakota Gasification] violated the Agreement by permanently transferring employees to the vacant positions." *Id.* at 10. In doing so, the Arbitrator adopted the Union's position that "if no employee applies for a vacant position, the Employer's only recourse is to temporarily transfer an employee to that vacant position." *Id.* at 8. The Arbitrator based his decision upon the express language of Article 10, Section 2, as well as the prior negotiations between the Union and Dakota Gasification.

With respect to the second question, the Arbitrator found that "[t]he Employer violated the agreement when it restricted those who could apply to the vacant positions to those currently working at the Pay Level for the vacant position." *Id.* at 13. Each of the four notices in question "required the applicant to have 'current work experience as a qualified Field Technician.'" *Id.* at 10. The Arbitrator concluded that the "current work experience" requirement greatly limited the pool of potential applicants that could apply for the openings. For example, at the time the Tech V notice was posted, there were only five employees that worked at that level. Therefore, under the "current work experience" standard included in the notices, only those five individuals could have applied for the job opening. As stated by the Union, "[t]he Company had deliberately crafted the requirements so as to eliminate almost all of the more than 400 employees who could have otherwise bid on the posted job, by requiring that the applicant have 'current experience' in the area of the job vacancy." *See* Petitioner's Reply to Counterclaim and Memorandum in Opposition to Motion for Summary Judgment, p. 6. Instead, the Arbitrator found that Dakota Gasification should have used the "minimum qualifications" standard appearing in Article 7, Section 10. The Arbitrator reasoned that such wording would open the potential applicant pool to all employees "who might have been 'competent' to perform the tasks or who 'can do the job,' but do not presently work in the classification in question." Respondent's Ex. A, p. 11. As a result, the Arbitrator ordered that '[t]he Employer must repost the notices for the four positions covered by these grievances and the notice shall not preclude those who possess minimum qualifications from applying. *Id.* at 13.

## II. STANDARD OF REVIEW

The Eighth Circuit has set forth a deferential standard for reviewing arbitration awards at the district court level:

> When reviewing an arbitral award, courts accord, "an extraordinary level of deference" to the underlying award itself, *Keebler Co. v. Milk Drivers & Dairy Employees Union, Local No. 471*, 80 F.3d 284, 287 (8th Cir.1996), because federal courts are not authorized to reconsider the merits of an arbitral award "even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *Bureau of Engraving, Inc. v. Graphic Communication Int'l Union, Local 1B*, 284 F.3d 821, 824 (8th Cir.2002) (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)). Indeed, an award must be confirmed even if a court is convinced the arbitrator committed a serious error, so "long as the arbitrator is even arguably construing or applying

the contract and acting within the scope of his authority." *Bureau of Engraving*, 284 F.3d 821, 824 (quoting *Misco*, 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286).

The Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–16, established "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Thus the FAA only allows a district court to vacate an arbitration award

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators, or either of them.

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

Similarly, under 9 U.S.C. § 11 a reviewing court may only modify the arbitrator's award

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

(c) Where the award is imperfect in some matter of form not affecting the merits of the controversy.

9 U.S.C. § 11.

A "district court must take the award as it finds it and either vacate the entire award using section 10 or modify the award using section 11." *Legion Ins. Co. v. VCW, Inc.*, 198 F.3d 718, 721 (8th Cir.1999). The deference owed to arbitration awards, however, "is not the equivalent of a grant of limitless power," *Leed Architectural Prods., Inc. v. United Steelworkers of Am., Local 6674*, 916 F.2d 63, 65 (2d Cir.1990), and "courts are neither entitled nor encouraged simply to 'rubber stamp' the interpretations and decisions of the arbitrators." *Matteson v. Ryder Sys. Inc.*, 99 F.3d 108, 113 (3d Cir.1996). Thus, courts may also vacate arbitral awards which are "completely irrational" or "evidence [ ] a manifest disregard for the law." *Hoffman v. Cargill Inc.*, 236 F.3d 458, 461 (8th Cir.2001) (internal quotations and citations omitted).

*Stark v. Sandberg, Phoenix & von Gontard*, 381 F.3d 793, 798–99 (8th Cir.2004).

## III. LEGAL DISCUSSION

Dakota Gasification seeks to vacate or modify the arbitration award. The thrust of Dakota Gasification' argument is that the Arbitrator exceeded his authority by deciding an issue that was neither grieved nor submitted by the parties; namely, the content of the posting notice. Consequently, Dakota Gasification asks the Court to vacate that portion of the Arbitrator's award. The Union resists such an approach, and seeks confirmation of the award in its entirety. Both parties have submitted very thorough briefs on the issue.

If the decision concerning the content of the posting notice was improper, the ap-

propriate remedy would be modification. *See Legion Ins. Co. v. VCW, Inc.*, 198 F.3d 718, 721 (8th Cir.1999) (A "district court must take the award as it finds it and either vacate the entire award using section 10 or modify the award using section 11.").[2] As a result, the Court must follow 9 U.S.C. § 11. Specifically, the law allows for modification of an arbitration award "[w]here the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted." 9 U.S.C. § 11(b).

 It is well-established that "[a]n arbitrator's award must be upheld as long as it 'draws its essence' from the collective bargaining agreement." *Lackawanna Leather Co. v. United Food & Commercial Workers Int'l Union, AFL–CIO*, 706 F.2d 228, 231 (8th Cir.1983) (quoting *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596–97, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Food & Commercial Workers, Local No. 222, AFL–CIO v. Iowa Beef Processors, Inc.*, 683 F.2d 283, 285 (8th Cir. 1982)). "The [United States] Supreme Court has held that an arbitrator does not exceed the scope of the issue presented to him as long as the arbitrator 'stays within the areas marked out for his consideration.'" *Id.* (quoting *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)). "An arbitrator can bind the parties only on issues that they have agreed to submit, and whether the arbitrator has exceeded those bounds is a proper issue for judicial determination." *Id.* at 233 (Gibson, J. dissenting) (citing *Int'l Ass'n of Machinists, District 776 v.*

*Texas Steel Co.*, 639 F.2d 279, 283 (5th Cir.1981)); *see Kansas City Luggage & Novelty Workers Union, Local No. 66 v. Neevel Luggage Manufacturing Co.*, 325 F.2d 992, 994 (8th Cir.1964) (holding that an arbitrator may only decide issues that are "specifically or necessarily included in the subject matter submitted to arbitration."). "A court may vacate a labor arbitration award if the arbitrator exceeds the scope of the submission by ruling on issues not presented to him by the parties." *Id.* at 234 (Gibson, J. dissenting) (citations omitted); *see Centralab, Inc., Fort Dodge, Iowa v. Local No. 816, Int'l Union of Electrical, Radio and Machine Workers of America*, 827 F.2d 1210, 1217 (8th Cir. 1987) ("[W]here an arbitrator goes beyond his contractual authority to decide issues not properly before him, his award fails to draw its essence from the agreement and must be vacated, despite the usual great deference given to arbitrator's awards."). Some courts have held that "[t]he arbitrators interpretation of the scope of the issue must be upheld as long as it is rationally derived from the parties' submission." *American Postal Workers Union, AFL–CIO v. Runyon*, 185 F.3d 832, 835–36 (7th Cir.1999) (citing *Richmond Fredericksburg & Potomac R.R. Co. v. Transportation Communications Int'l Union*, 973 F.2d 276, 280 (4th Cir.1992)). Ultimately, "[i]n determining whether an arbitrator has exceeded his authority, the agreement must be broadly construed with all doubts being resolved in favor of the arbitrator's authority." *Id.* at 230–31 (citing *Resilient Floor and Decorative Covering Workers, Local Union 1179 v. Welco Mfg. Co.*, 542 F.2d 1029, 1032 (8th Cir.1976)).

---

2. Dakota Gasification concedes that the transfer issue was properly before the Arbitrator. See Respondent's Memorandum in Support of Motion for Summary Judgment and in Opposition to Motion to Confirm Award, p. 10

("While the Company disagrees with the Arbitrator's decision on the transfer issue, such determination was within the Arbitrator's jurisdiction.").

Having carefully reviewed the post-hearing briefs, the four grievances, as well as the Agreement, the Court is satisfied that the Arbitrator did not exceed the scope of the issue presented to him by deciding the issue concerning the content of the posting notice. It is significant to note that both parties mentioned the content of the posting notice in their post-hearing briefs. *See* Respondent's Ex's D & E.[3] However, Da-

3. The following arguments appear in the Union's post-hearing brief:

> Because of the effects of scheduling, crew or shift assignments were the subject of much debate in the initial contract bargaining. Since the adoption of the initial contract, the provisions of the contract that deal with procedures related to job posting and transfers of employees between shifts have been addressed in two previous arbitration proceedings. Yet, the interpretation of these contract provisions continues to be disputed.
>
> . . . . .
>
> If the Company's position is upheld that allows the Company to transfer employees from shift to shift to fill unfilled positions, the transfer provision in the Contract has no meaning. The Company can simply post positions in a manner in which there will be no qualified employees who want to apply or are eligible to apply for the vacancy and then make every transfer a permanent one.
>
> . . . . .
>
> After the initial Contract was negotiated, the Company tried to continue that practice under the guise of completing a job "reassignment", rather than a "transfer." See previous arbitration award of arbitrator Schwartz, submitted as Joint Exhibit 2. That practice was halted after Schwartz' award. In follow-up, the Company began posting positions that included such restrictions in the job qualifications that only persons already trained in the department where a vacancy occurred were qualified to apply for the jobs. See job postings offered by Company as Company exhibits A–D, each of which requires "current work experience" in the department where the vacancy is posted for. For example, in each of the grievances that are part of this proceeding, the only qualified applicants were already working a shift of their choice in the department where they were transferred. The employees worked shifts where they could car pool with fellow shift workers, socialize with the same workers, and schedule and plan vacations in advance, knowing what their shift schedule was a year in advance. When the Company could not fill these positions, the Company, basically, went back to "reassigning" an employee from one shift to another and called this a "permanent transfer" that required nothing more from the Company than to require the employee to transfer to a different position. Respondent's Ex. D, pp. 3, 5–6. The Union also included the following analysis regarding Article 7, Sections 10 and 11:

> Those sections were intended to mean what they say; that is, job bidding is open to ALL employees, not just those having "current experience" in a certain department. Employees wanted to be able to obtain new and broadened experience by bidding for jobs in different departments from where they work. Under the Company's method of posting, only employees from the same department can bid the jobs. This limits job bidding to the four rotating crews in each department and does not allow the other 400 plus employees an opportunity to bid for the jobs. The Union's intent behind the above provisions was to allow the Company to fill unfilled, posted jobs with temporary placements while allowing the Company to train someone fro a permanent position.

Respondent's Ex. D, pp. 7–8.

In closing, the Union stated:

> Further, the Company additionally has the ability to make vacant positions available to more employees. It has a large work force to draw from if the entire employee pool is allowed to participate in job selections. For this to occur, the Company can modify the job qualifications for vacant positions to allow for more employees the opportunity to bid, it can temporarily place someone in the positions while training another for the positions, and it can offer other incentives for voluntary transferees.

Respondent's Ex. D, p. 10.

Similarly, the brief submitted by Dakota Gasification also makes mention of the posting procedures and their effect on the transfer issue:

> "[T]he Company in the instant cases did post the open positions with crew designations and, therefore, fully complied with the decision of Arbitrator Schwartz. However,

kota Gasification has attempted to downplay its importance, and stated that such issues had already been resolved by prior arbitrators. *See* Respondent's Ex. E, p. 12. Dakota Gasification has also noted that the subject of the content of the job posting notice was not mentioned in any of the grievances. However, a careful reading of the grievances indicates otherwise. The grievances include what Dakota Gasification terms "catch all" phrases; i.e., the Company violated Article 10, Section 2 of the contract and *"any other"* article or provision that may have been violated. *See* Respondent's Ex. C (emphasis added). While Dakota Gasification takes the position that such a phrasing is unimportant, it is clear courts have held otherwise. *See National Gypsum Co. v. Oil, Chemical and Atomic Workers Int'l Union*, 147 F.3d 399, 403 (5th Cir.1998) (recognizing the significance of the Union's grievance which included the phrase "any other provisions of the agreement which may be found to apply" in evaluating the scope of the arbitrators authority). Additionally, some courts have granted "substantial weight" to the fact that the parties gave the arbitrator the authority to frame the issue as in the present case. *Int'l Chemical Workers Union v. Day & Zimmermann*, 791 F.2d 366, 368 (5th Cir.1986).

Of significant importance to the Court's determination is the case law in the Eighth Circuit, and around the country, which requires that great deference be given to the decision of the arbitrator, and the requirement that "the agreement must be broadly construed with all doubts being resolved in favor of the arbitrator's authority." There is a clear mandate that an extraordinary level of deference be given to an arbitra-

the issue in this case involves the right of the Company to transfer employees when a job has been posted and no employee signs the posting...." Importantly, there is no provision in the labor agreement which in

tion award. The Court finds that Arbitrator Fredric R. Dichter "stayed within the areas marked out for his consideration" and his award "drew its essence" from the collective bargaining agreement and must be upheld. Any modification of the award is unwarranted under the current state of the law.

## IV. CONCLUSION

For the following reasons, the Court GRANTS the Petitioner's Motion to Confirm Arbitration Award. (Docket No. 1). The Court DENIES the Respondent's Motion for Summary Judgment (Docket No. 6) and DISMISSES its counterclaim as moot. (Docket No. 8).

IT IS SO ORDERED.

any way restricts the Company's right to transfer employees after it has posted the positions in compliance with Article 7, Sections 10 and 11.
Respondent's Ex. E, p. 3.