**NCR CORPORATION, E & M–WICHITA, Plaintiff–Appellee,**

v.

**The INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, DISTRICT LODGE NO. 70, Defendant–Appellant.**

**No. 88–1479.**

United States Court of Appeals, Tenth Circuit.

July 5, 1990.

David K. Holmes, of Render & Kamas, Roger M. Theis, Wichita, Kan., for defendant-appellant.

Douglas L. Stanley, of Foulston, Siefkin, Powers & Eberhardt, Gerald Sawatzky, Gloria G. Flentje, Wichita, Kan., for plaintiff-appellee.

Before TACHA, BALDOCK, and GARTH, Circuit Judges.[*]

GARTH, Circuit Judge.

## I.

This appeal arises from a grant of summary judgment by the district court in favor of the plaintiff, NCR Corporation, E & M–Wichita ("NCR"). The judgment in favor of NCR also vacated and set aside an Arbitrator's Decision and Award.

Our review of the district court's ruling is plenary, and we utilize the same standard that the district court was required to

apply. *Russell v. American States Insurance Co.,* 813 F.2d 306, 308 (10th Cir.1987); *Solomon v. Klein,* 770 F.2d 352 (3d Cir. 1985); *Millmen Local 550 v. Wells Exterior Trim,* 828 F.2d 1373, 1375 (9th Cir.1987) (appellate court "reviews de novo a grant of summary judgment" vacating or enforcing an arbitration award).

Because the district court failed to adhere to the standard of review that has been established by legal precedent in this area, we reverse and reinstate the arbitrator's award in its entirety.

## II.

### A.

In 1986, NCR and District Lodge No. 70 of the International Association of Machinists, etc. ("union") were parties to a three-year collective bargaining agreement effective March 31, 1985. Pursuant to that contract, unresolved disputes during the contract term were to be submitted for arbitration to one of a group of mutually agreed-upon professional arbitrators. No article of the Agreement specifically addressed the issue of subcontracting as it pertained to machine shop operations, although the subject of subcontracting was referred to in the Management Functions clause. At the same time, the collective bargaining Agreement's Recognition clause made the union the exclusive representative for "all production and maintenance employees" at the Wichita location in regard to "conditions of employment."

On January 16, 1986, NCR informed the union that a work backlog had developed in its core machine shop operations. NCR required additional personnel to perform welding and brake work. Accordingly, NCR sought to hire outside temporary workers from Olsten Temporary Services to perform the welding and brake work inside the plant. The union objected on the grounds that welding and brake jobs were core job classifications covered in the parties' Agreement and were to be performed

[*] The Honorable Leonard I. Garth, Senior United States Court of Appeals Judge for the Third Circuit, sitting by designation.

only by members of the bargaining unit pursuant to the terms and conditions of the Agreement. The union proposed that either additional workers be hired or that existing employees be scheduled to work overtime.[1]

Beginning January 27, 1986, NCR hired two workers from Olsten who performed welding and brake work for about the next three weeks. On January 29, the union filed a grievance objecting to these hirings. NCR ultimately hired 24 temporary workers.[2]

NCR claimed that, under the collective bargaining Agreement, it was at liberty to subcontract its welding and brake work. Contrary to NCR's position, the union contended that only bargaining unit members were permitted to work at these jobs. Unable to resolve this disagreement themselves, an arbitrator was designated pursuant to the procedures provided for in the Agreement.

## B.

Both NCR and the union agreed that the key issue for interpretation was created by the construction to be given to the Recognition article of the Agreement on the one hand, and to the Management Functions article of the Agreement on the other. On July 3, 1987, after a full hearing with briefs by the parties, the arbitrator issued a detailed and lengthy opinion of over 50 pages.

The arbitrator found that the plain language of the collective bargaining Agreement, insofar as it concerned subcontracting of production work, was ambiguous even though both sides had provided "many contract references." Because he could not resolve the dispute by reference to plain and explicit language found in the contract's terms, the arbitrator turned to an extensive analysis of extrinsic and other evidence. In his opinion the arbitrator reviewed and examined evidence and authorities that would help give meaning to the ambiguous language of the contract. This included: other terms in the contract; the negotiating and contractual history of the parties, which would also help reveal their intent; evidence of past practices; a number of published arbitration, NLRB, and judicial decisions; and the common law of the shop.[3]

---

1. The union concedes (Appellant's Br., at 4) that NCR interviewed several job applicants but found them unqualified. It is not clear from the record from what pool these applications were drawn. The record does not reveal whether NCR scheduled overtime from its own employees.

2. The union amended the grievance on February 20 and again on March 3 to include objection to NCR's additional hiring from Olsten of two temporary shop "utility" workers and four assemblers on those respective dates.

3. These are the same sources used for interpreting the ambiguous language of contracts generally. None of them substitutes for or supplants the language of the contract, but they all help interpret ambiguities in that language. The "common law of the shop" is peculiar to labor-management agreements, but it functions as a source of meaning for the parties in a manner similar to that of "trade custom and usage" in the commercial contract context. See, Strathmore Paper Co. v. United Paperworkers Intrntl. Union, 900 F.2d 423, 429 (1st Cir.1990) (industrial common law akin to trade custom and equally a part of the collective agreement).

 As the Supreme Court held in its landmark arbitration cases of thirty years ago, a collective agreement "calls into being a new common law—the common law of a particular industry or of a particular plant." United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 579, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960). Writing of the arbitrator and his function, the Court went on to hold that "[t]he labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." Id., at 581–82, 80 S.Ct., at 1352–53.

 The role of the common law of the shop in labor contract interpretation has been forcefully restated in recent opinions of this court. See, Sterling Colorado Beef Co. v. United Food and Commercial Workers, 767 F.2d 718, 721 (10th Cir.1985) ("the arbitrator's source of law is not ... confined to the express provisions of the contract. The 'industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it.'") (quoting Warrior & Gulf); Oil, Chemical & Atomic Workers International v. Amoco Oil Company, 885 F.2d 697, 713 (10th Cir.1989) (Baldock, J., dissenting) (industrial common law and terms of contract agreement are the domain of the arbitrator).

Specifically, the arbitrator found that Article I, the Recognition clause, rendered the union the sole representative of the employees whose jobs were covered by the contract.[4] Thus, he held that NCR's right to subcontract, as provided in Article III, the Management Functions clause,[5] could not be construed so as to preclude or undermine the union's exclusive representation for conditions of employment affecting "all production and maintenance" workers. Hence, the arbitrator interpreted the contract as limiting those operations or functions that could be subcontracted within the plant to non-bargaining unit employees. Essentially, the arbitrator held that permissible subcontracting consisted of, or involved work of, a special or unusual sort, not central to the productive activity of the plant in question, often taking place outside the plant itself, or involving peripheral or fully ancillary activities such as security, janitorial and cleaning services, some trucking, installation of equipment, painting, roofing, food service, and the like.

Thus, he held that subcontracted work, as that concept has emerged from the common law of the shop, is not generally under the supervision or control of the employer. Furthermore, subcontracted workers may not displace employees covered by the collective bargaining Agreement. In so holding, the arbitrator adopted the criteria espoused in leading arbitration cases and which we discuss *infra* at 1505.

The arbitrator's opinion concluded that NCR had violated its contract with the union by subcontracting welding and brake work. As a consequence of finding a continuing violation, he imposed a back pay remedy.[6]

### C.

On March 13, 1987 NCR filed a complaint in the district court asking that the arbitrator's award be vacated on the grounds that it was "arbitrary and capricious," did not "draw its essence" from the contract, was not "within the terms of the agreement," and "represented only the arbitrator's own brand of industrial justice." NCR amended its complaint in August to accommodate the final version of the arbitrator's opinion and award and on October 5, 1987 moved for summary judgment.[7]

On February 26, 1988 the district court judge issued a Memorandum and Order vacating and reversing the arbitrator's Decision and Award and granting summary judgment to NCR. 1988 WL 122736. The district court, relying on Article III of the collective bargaining Agreement (*see supra* n. 5), held that NCR retained the exclusive right to subcontract work as it deemed necessary. The district court concluded that " '[s]ubcontract' is not an ambiguous term, and the arbitrator's statement to the contrary is unfounded and unsupportable." Dist. ct. op., at 6. The district court also held that the arbitrator had rewritten the collective bargaining Agreement, "ignoring ... the contract itself as well as the parties' intent." *Id.,* at 9. Thus, the district

---

**4.** Article I of the collective bargaining Agreement, in pertinent part, provides that:

The Company recognizes the Union as the sole and exclusive bargaining representative for wages, hours, working conditions *and* other conditions of employment ... for all production and maintenance employees ... employed by the Company and its Wichita, Kansas plant....

**5.** Article III of the collective bargaining Agreement, in pertinent part, provides that:

All Management functions and rights which the company has not expressly modified by this Agreement are retained ... including ... the right to ... subcontract work as deemed necessary or desirable ... and otherwise generally manage the plants and direct the working force.

**6.** Specifically, he directed that NCR pay the union the difference between the rates paid workers hired through Olsten back to 1979 and the wage rates governing under the controlling collective bargaining agreement. Arb.Op., at 49–52.

**7.** NCR's March 13, 1987 Complaint is found at App. I–5. The amended complaint of August 10, 1987 is found at App. II–5; it rested on the same allegations. Somehow, NCR, in its original complaint, had interpreted the arbitrator's December 13, 1986 "digest" of his forthcoming opinion as the actual opinion itself, even though it began, "Gentlemen:/Attached is a digest of what my decision will be."

court concluded that the arbitrator's decision did not draw its essence from the contract because, in its view, the Agreement was not susceptible to the arbitrator's interpretation. This appeal followed.

## III.

### A.

Nearly thirty years ago the Supreme Court determined that a labor arbitration award should be enforced "so long as it draws its essence from the collective bargaining agreement." *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). The Court has resisted any erosion of that position, holding as recently as 1987 that

> the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract. ... [A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.

**8.** The Supreme Court found very few exceptions: "Of course, decisions procured by the parties through fraud or through the arbitrator's dishonesty need not be enforced." *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 37–38, 108 S.Ct. 364, 370–71, 98 L.Ed.2d 286 (1987).

**9.** *See, e.g., Maine Central Railroad Co. v. Brotherhood of Maintenance Employees*, 873 F.2d 425, 428 (1st Cir.1989) ("Judicial review of an arbitration award is among the narrowest known in the law"); *Connecticut Light & Power Co. v. Local 420, International Brotherhood of Electrical Workers*, 718 F.2d 14, 19–20 (2d Cir.1983) (existence of contrary awards does not lessen deference owed arbitrator's decision where drawn from essence of contract); *NF & M Corp. v. United Steelworkers*, 524 F.2d 756, 759–60 (3d Cir.1975) (neither ambiguity in arbitrator's opinion nor court's own lack of agreement with opinion justifies vacating award unless there is "no support whatever" in the record before the arbitrator); *United Food and Commercial Workers v. Marval Poultry Co., Inc.*, 876 F.2d 346, 351 (4th Cir.1989) (endorsing only narrow basis for challenging arbitration awards); *International Association of Machinists v. Texas Steel Co.*, 538

*United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 37–38, 108 S.Ct. 364, 370–71, 98 L.Ed.2d 286 (1987).[8]

This court has elaborated the same position. *See, Jenkins v. Prudential–Bache Securities, Inc.*, 847 F.2d 631, 635 (10th Cir.1988) ("the court will not interfere with an arbitrator's decision unless it can be said with positive assurance that the contract is not susceptible to the arbitrator's interpretation") (*quoting, Sterling Colorado Beef Co. v. United Food and Commercial Workers*, 767 F.2d 718, 720 (10th Cir. 1985)). Indeed, the Courts of Appeals have uniformly called for deference to an arbitrator's decision even where the arbitrator has arguably misconstrued a contract—providing, of course, that the arbitrator's award draws its essence from the collective bargaining agreement.[9]

Even when the terms of a collective bargaining agreement may be characterized as ambiguous, judicial deference to the arbitrator is still in order. "[A]mbiguity in the opinion accompanying an award, which permits the inference that an arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award." *Enterprise Corp.*, 363 U.S., at

F.2d 1116, 1121 (5th Cir.1976) ("'essence' standard is to be interpreted expansively" and in favor of arbitral award); *American Federation of Television and Radio Artists v. Storer Broadcasting Co.*, 745 F.2d 392, 397 (6th Cir.1984) ("specialized competence of arbitrators [in] law of the shop" calls for broadest deference unless "no support whatever in record"); *Hill v. Norfolk & Western Rwy.*, 814 F.2d 1192, 1195 (7th Cir.1987) ("party [may not] complain merely because the arbitrators' interpretation is a misrepresentation.... Once the court is satisfied that they were interpreting the contract, judicial review is at an end, provided there is no fraud or corruption" or illegal act); *Manhattan Coffee Co. v. International Brotherhood of Teamsters*, 743 F.2d 621, 624 (8th Cir.1984) ("any doubts are to be resolved in favor of the validity of the arbitrator's award"); *Local 1020, United Brotherhood of Carpenters v. FMC Corp.*, 658 F.2d 1285, 1294 (9th Cir.1981) (arbitrator's special mandate demands broad discretion); *Butterkrust Bakeries v. Bakery, Confectionery and Tobacco Workers*, 726 F.2d 698, 699 (11th Cir.1984) (review limited to whether arbitrator's award is irrational, exceeds scope of authority, or fails to draw essence from the contract.)

598, 80 S.Ct., at 1361. Constrained by the narrow scope of review mandated when a court reviews an arbitrator's award, a court may not overturn an arbitrator's decision even when error has been committed (*Misco*, 484 U.S., at 37–40, 108 S.Ct., at 370–72), or where the reviewing court would interpret the evidence in a contrary manner.

■ Indeed, no matter how dubious an arbitrator's decision might appear to a reviewing court, if the arbitrator did not stray beyond the four corners of the agreement to find the essence of his decision, the arbitrator's award must be upheld. The standard which is binding upon both the district court and this court requires that the court defer to, and give effect to, an arbitrator's decision when it draws its essence from the agreement of the parties. The court must be guided by the principle that

> [i]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

*Enterprise Corp.*, 363 U.S., at 599, 80 S.Ct., at 1362.

As the standard has been explained by another Court of Appeals,

> This narrow standard of review is mandated by a strong Congressional policy of encouraging the peaceful resolution of labor disputes by means of binding arbitration. In furtherance of that policy,

the courts decline to review the merits of arbitration awards so that both employers and unions can be confident in obtaining the decision of the arbitrator for which they have bargained.

*Kane Gas Light & Heating Co. v. Intrntl. Brotherhood of Firemen and Oilers*, 687 F.2d 673, 678 (3d Cir.1982).

■ Of course, we will not defer to an arbitrator's decision where the arbitrator's award does not satisfy the standard prescribed, or where the award is in manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop. Our task, therefore, as was the district court's,[10] is limited to determining whether the arbitrator, in interpreting the parties' Agreement in this case, adhered to the recognized standard which we have identified above.

Our independent review of the arbitrator's Decision and Award in light of our settled standard of review, satisfies us that the arbitrator here stayed well within his prescribed bounds of authority when he construed the Agreement to prohibit NCR from hiring temporary workers from Olsten as subcontractors to perform welding and brake work normally performed by bargaining unit employees of NCR. While it is evident that Article III does provide that NCR may "subcontract work as deemed necessary or desirable," it is also evident, as the arbitrator observed, that NCR had recognized the union in Article I as the "sole and exclusive bargaining representative for wages, hours, working conditions [etc.] ... for all [NCR] production and maintenance employees." [11]

---

10. *See, e.g., Public Service Co. of Colorado v. IBEW, Local Union 111,* 709 F.Supp. 212, 214 (D.Colo.1989).

11. *See supra* notes 4–5. The Recognition Clause (Article I) has often been interpreted to afford the union substantive rights in regard to subcontracting. Thus, numerous arbitrations have concluded that the "unit definition and recognition clause" of contracts indicate that the parties "... bargain[ed] for the performance of certain work and set the terms for such performance" *National Distillers and Chemical Corp.,* 76 LA 286, 288 (Gibson 1981) (quoting *Pet Milk Co.,* 33 LA 278, 279 (McCoy 1959)). Work over which the union has the exclusive right to negotiate the terms and conditions may not be subcon-

tracted. Other cases have held particular subcontracting a "violation of [the] labor agreement even in the absence of express language prohibiting it ... [where performed] under the same circumstances at [the] same location and using [the] same equipment...." *Campbell Truck Co.,* 73 LA 1036, 1040 (Ross 1979) (citing *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

Other arbitration decisions have determined that where a contract contains a standard recognition clause, the key test for permissibility of a particular subcontracting scheme is whether it "deprive[s] unit employees of work customarily performed by them." *Consolidated Aluminum Co.,* 66 LA 1170 (Boals 1976). "Contracting out

Having concluded that mere reference to these Articles could not settle the dispute between the union and NCR, the arbitrator then referred to other terms in the Agreement.[12] He then examined the negotiating and contractual history of the parties,[13] past practices, the common law of the shop, and a number of arbitration, NLRB, and judicial decisions providing definition to the key terms, "subcontracting" and "conditions of employment" Arb.Op. at 29–47.

The arbitrator then effectively applied this evidence, and these principles, to the criteria for permissible subcontracting—criteria that have evolved through industrial case law and which are catalogued in M. Stone, *Labor Management Contracts at Work* 26 (2d ed. 1979)[14]:

1. [It] must not have been intended to nor actually deprive a substantial number of bargaining unit employees of work in classifications covered by the agreement.

2. [It] must be in conformance with past practices not previously objected to by the union, or must not be instituted by the company as a new practice.

3. [It] must be in good faith or not an effort to subvert the expressed terms of the agreement.

4. [It] must not be an attempt to evade substantial provisions of the agreement ... or violate the spirit, intent, or purposes of the agreement.

5. [It] must be dictated by the requirements of the business for efficiency, economy or expeditious performance.

6. [It] must not be unreasonable, arbitrary, discriminatory, nor intended to harm, prejudice, or undermine the union.

Analyzing all the factors mentioned above in light of the language of the Agreement between NCR and the union, the negotiating and contractual history of the parties, past practices, published arbitration and judicial decisions, and the common law of the shop,[15] the arbitrator arrived at a conclusion similar to the ones articulated in *Buhr Machine Tool*, 61 LA 333, 337–8 (Sembower 1973) and *American Sugar Refining Co.*, 36 LA 409, 414 (Crawford 1960):

The power to subcontract is the power to destroy. Obviously the Company cannot recognize the Union as exclusive agent for its unit employees, agree upon terms of employment, and then proceed ... to reduce the scope of the unit or to undercut the terms of the Agreement.

Thus contracting out cannot be used as a device for undermining the status of the recognized exclusive agent.... Nor can contracting out be used (even unwittingly) ... [to place the union] in the position of having to agree to cut contract terms in order to persuade the Company not to subcontract the jobs of the represented employees.

Arb.Op., at 47.

The arbitrator assessed the case before him as:

---

to purchase [a] cheaper labor force constitutes serious breach of [the] employer's implied obligations of good faith and fair dealing." *Uniroyal, Inc.*, 76 LA 1049 (Nolan 1981).

**12.** For example, Article XXXIV, waiving renegotiation of any terms during the contract term; Article II, the future coverage clause, in which NCR promised not to reorganize itself so as to avoid the terms of the Agreement; Article XXVII, the seniority clause; and others.

**13.** In its Brief at 24, for example, the union contends that it presented witnesses, past negotiators, who testified that the language of Article III "was never intended to, and did not, authorize the performance of bargaining unit work by non-unit personnel on the company's own premises," etc. NCR took a contrary position on this matter.

**14.** Stone recounts the synthesis and study of scores of cases in this area and the common law of the shop that had developed around them. Arb.Op., at 47.

**15.** These are some but not all of the factors an arbitrator may consider. The analysis is one of a totality, not of identifying a single particular provision. *Chicago Newspaper Publishers' Assn. v. Chicago Web Printing Pressmen's Union*, 821 F.2d 390, 394 (7th Cir.1987). *See also, Laborers Health and Welfare Trust Fund v. Kaufman & Broad*, 707 F.2d 412 (9th Cir.1983) (essential to consider intent of the parties); *Super Tire Engineering Co. v. Teamsters Local 676*, 721 F.2d 121 (3d Cir.1983) ("language," "context," "intent" among valid considerations).

even more egregious in the sense that NCR brought the alleged subcontractor employees right into the plant alongside employees of NCR—represented by the IAM Agreement—doing exactly the same kind of work as those IAM members described in the IAM Contract. If the language of the "Recognition" clause has any meaning at all[,] it certainly prohibits that sort of activity by any employer.

Arb.Op., at 31–32.

### B.

■ We cannot agree with the district court that the arbitrator's determination in this case failed to draw its essence from the collective bargaining Agreement. Indeed, if we were permitted to offer our own independent construction of the parties' Agreement, based on the record developed through arbitration which shed light on the terms of the Agreement, we could not say that the Agreement of the parties was as plain, clear, and unambiguous as the district court found it to be.[16]

As the Seventh Circuit recently held in sustaining an arbitrator's interpretation of a collective bargaining agreement involving subcontracting, and concededly interpreting a Management Rights clause somewhat different from the Article III Management Functions clause of this contract, but one equally broad in its scope and thrust:

> One method of avoiding the central obligations of the [collective bargaining] agreement would be to lay off workers and subcontract their work to persons who would perform the identical work and on company premises but be paid less for it. See *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 214 [85 S.Ct. 398, 404, 13 L.Ed.2d 233] (1964) .... When asked what provision forbade such subcontracting [employer's counsel] said there was no specific provision but

that the agreement implicitly forbids measures inconsistent with its central purposes. In other words, the agreement contains implied as well as express terms ... and the implied terms may require that the management-rights provision be given a narrower scope than its language might suggest. An arbitrator is not obliged to read a contract literally.

*Dreis & Krump Mfg. Co. v. International Assoc. of Machinists,* 802 F.2d 247, 252–53 (7th Cir.1986) (citations omitted).

In *Dreis & Krump* Judge Posner concluded, as we do here, that so long as the arbitrator interpreted the contract in making his award, his award must be affirmed, even if he, in fact, misinterpreted that contract. *Id.* at 253.

We do not hold that the arbitrator here did, or did not, misinterpret the Agreement. That is not our function. Rather, as we have explained and emphasized, our function is to do no more than determine whether the arbitrator's decision was drawn from the Agreement and the several permissible sources he employed to enable him to render his Decision and Award. We hold that the arbitrator here fully complied with his assignment, in that his award drew its essence from the parties' collective bargaining Agreement.

### IV.

In conclusion, we will reverse the district court's order of February 26, 1988 which vacated the arbitrator's Decision and Award of July 3, 1987 and which granted summary judgment to NCR. In accordance with the foregoing opinion, we direct that the arbitrator's Decision and Award be reinstated in its entirety.

---

16. The most recent available cumulative index of reported arbitration decisions lists approximately 200 *published* arbitration decisions between 1983 and 1988 devoted to the sole question of subcontracting. See, (BNA) *Labor Arbitration Cumulative Digest and Index* for vols. 81–90, at 539–554.

In many of these cases, the contract language was as brief and seemingly unambiguous as the language of Articles I and III here. Yet, when examined in the appropriate context by an arbitrator, the language proved to be every bit as ambiguous and contestable as it was found to be by the arbitrator here.