UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-30699
_____


NATIONAL GYPSUM COMPANY,

                              Plaintiff-Appellant,


                    versus


OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION; OIL,
CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, Local 4-447,

                              Defendants-Appellees.

_____

        Appeal from the United States District Court for the
                    Eastern District of Louisiana
        _____
                        July 17, 1998

Before BARKSDALE, BENAVIDES, and DENNIS, Circuit Judges.

BENAVIDES, Circuit Judge:

     The district court granted summary judgment to the Oil,
Chemical, and Atomic Workers International Union and its Local 4-
447 on their motion to enforce an arbitration award and denied
National Gypsum Company summary judgment on its motion to vacate
that award.  We affirm.

On January 30, 1994, National Gypsum Company and Oil, Chemical, and Atomic Workers International Union Local 4-447 entered into a collective bargaining agreement ("the Agreement"), which covered nonsupervisory production employees at National Gypsum's plant in Westwego, Louisiana, from February 1, 1994, through February 1, 1997. Before September 1994, employees at the Company were scheduled to work seven consecutive days each week with attendant overtime pay. Workers were paid time and a half on Saturdays and double time on Sundays. The seven-day work week had been in effect for 30 years at the Westwego plant. In the summer of 1994, however, the Company announced a "day-off" program, effective in September 1994, under which no employee would work more than six days in any week. Although at first blush the day-off program might seem advantageous to the employees, the program resulted in the loss of overtime pay. Consequently, on September 1, 1994, the Union filed a grievance in which it complained that "[t]he company refuses to pay premium pay to the employees affected by the day off," and that the refusal violated Article I, § 28 of the Agreement and any other provisions of the Agreement found to apply. Section 28 provides that "[n]o employee will be laid off[1] during the work week for the sole purpose of offsetting overtime worked during the week." The parties were unable to resolve their dispute.

---

[1] The parties agree that the term "laid off" can mean not having work for a period as short as one day.

In June 1995, the Company demanded arbitration in accordance with Article X, § 69, which allows either party to request arbitration if more informal dispute resolution mechanisms fail. The parties agreed to bifurcate the liability and damage portions of the arbitration. The liability portion of the arbitration took place on July 10, 1996. The arbitrator found in favor of the Union, reasoning that, because the day-off program was a wage change and because the Agreement required the Company to negotiate with the Union over wage changes, the Company had violated the Agreement by instituting the day-off program unilaterally. The arbitrator further concluded that the parties intended the Agreement to reflect the seven-day work week with its attendant overtime pay. In support of this conclusion, he relied on § 22 of the Agreement, which defines the work week as running from Monday to Monday, and §§ 23-24, which address overtime pay.

The Company filed a motion to vacate the arbitration award in federal district court. The Union filed a counterclaim to enforce it. Both parties filed motions for summary judgment. The district court denied the Company's motion and granted the Union's. This appeal followed.

## II.

We review the district court's decision to enforce the arbitration award *de novo*, using the same standards used by the district court. *See Gulf Coast Indus. Workers Union v. Exxon Corp.*, 991 F.2d 244, 248 (5th Cir. 1993). Our review of the

3

arbitrator's decision is extremely deferential. *See Executone Information Sys., Inc. v. Davis*, 26 F.3d 1314, 1320 (5th Cir. 1994). An arbitrator's award cannot be reversed if the matter was subject to arbitration and the arbitrator's decision "drew from the essence of the collective bargaining agreement." *International Ass'n of Mach. & Aerospace Workers, Dist. 776 v. Texas Steel Co.*, 538 F.2d 1116, 1119 (5th Cir. 1976).

Although the arbitrator's construction of a contractual provision may not be the only possible construction or even a correct one, it must nevertheless be upheld unless the arbitrator's decision does not "concern[] the construction of the contract," *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S. Ct. 1358, 1362 (1960), or is not "rationally inferable" from the letter (or even the purpose) of the collective bargaining agreement, *Local Union 59, International Bhd. of Elec. Workers v. Green Corp.*, 725 F.2d 264, 268 (5th Cir. 1984) (citations omitted). Reversal is not proper when "the arbitrator misreads the contract, where there is room to do so . . . ." *Id*. (citing *United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 38, 108 S. Ct. 364, 371 (1987)). Even if "a court is convinced [that the arbitrator] committed serious error[, that] does not suffice to overturn his decision." *Misco*, 484 U.S. at 38, 108 S. Ct. at 371.

A.

The parties were unable to stipulate to the issue to be decided by the arbitrator. The Company proposed that the

4

arbitrator decide, "Whether the Company violated Article V, [§] 28, of the parties' Collective Bargaining Agreement on September 3 and 4, 1994, by laying off employees during the workweek for the sole purpose of offsetting overtime during the week." The Union, on the other hand, believed that the arbitrator should decide, "Did the Company violate the Collective Bargaining Agreement, in the manner in which they begin [sic] scheduling employees['] work week on or about August 29, 1994 and continuing through September 1995?" The arbitrator framed the issue broadly as "Whether the Company violated the collective bargaining agreement by its institution of the 'day-off' program on or about September 1, 1994." More precisely, the arbitrator considered whether the company had a duty to bargain with the Union over the institution of the day-off program, and, if so, whether it violated that duty by instituting the program unilaterally.

The Company claims that the arbitrator exceeded his authority by framing the issue as a bargaining rather than a scheduling issue, especially in light of § 72 of the Agreement, which provides that the arbitrator "shall deal only with the single matter which occasioned his appointment." The district court concluded that the parties gave the arbitrator authority to frame the issue and that the issue framed was "rationally derived" from the issues submitted by the parties. We agree.

Although an arbitrator is generally "not free to reinterpret the parties' dispute and frame it in his own terms," *Piggly Wiggly Operator's Warehouse, Inc. v. Piggly Wiggly Operator's Warehouse*

5

*Indep. Truck Driver's Union, Local No. 1*, 611 F.2d 580, 584 (5th Cir. 1980), "[i]t is appropriate for 'the arbitrator to decide just what the issue was that was submitted to it and argued by the parties,'" *Day & Zimmerman*, 791 F.2d at 369 (quoting *Waverly Mineral Prods. Co. v. United Steelworkers of Am.*, 633 F.2d 682, 685 (5th Cir. 1980)). Moreover, this court in *Day & Zimmerman* gave "substantial weight" to the fact that the company had given "the arbitrator authority to frame the issue." 791 F.2d at 368. Where, as here, the parties have not formally stipulated to the issue to be submitted, the courts have looked to the grievance for guidance regarding what issue is before the arbitrator. *See, e.g.*, *Piggly Wiggly*, 611 F.2d at 584.

In this case, the Company went forward with arbitration, initiated at its own request, knowing that it had been unable to agree with the Union as to the precise issue presented. Indeed, the Company indicated to the arbitrator in its opening argument that the parties disagreed on the issue presented for the arbitrator's resolution and presented argument to the arbitrator regarding the scope of the issue presented. In doing so without objecting that the arbitrator lacked the authority to determine the issue presented, the Company impliedly consented to allow the arbitrator to frame the issue.

The statement of the issue presented by the Union was broad enough to be understood as a general challenge to the institution of the day-off program. Moreover, the Union's grievance cited to "any other provisions of the agreement which may be found to

apply." Under these circumstances, the arbitrator was entitled to consider whether the institution of the program violated § 5, which the arbitrator construed to create a duty to bargain with the Union.[2] Thus, we conclude that the arbitrator did not exceed his contractual authority in framing the issue as whether the day-off program violated the Company's bargaining obligation.

## B.

The Company also complains that the arbitrator exceeded his contractual authority because his decision is contrary to the express terms of the Agreement. Although this court does not review the merits of an arbitration award, "arbitral action contrary to express contractual provisions will not be respected." *Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial*

---

[2] The Company also argues that a portion of the testimony of a Union representative demonstrates conclusively that the Union was not challenging the institution of the day-off program:

Q:  Just so I am clear on the union's contention, and you were the one that filed the grievance, it was not the union's contention in filing that grievance that the company didn't have the right to institute a day-off program, was it?
A:  No.
Q:  Is it your contention that the entire day-off program had as its motive the elimination or reduction of overtime?
A:  Yes.
Q:  And that's the basis of your whole contention here?
A:  Yes.
Q:  If that's the case, what you are really saying is that the company cannot have a day-off program?
A:  No, I'm not saying that.
Q:  We can have a day-off program--
A:  Yes, you can.

The district court concluded that "the arbitrator could have reasonably interpreted the Union representative's concession that the company could implement **a** day-off program to in no way preclude a claim that the institution of **this particular** day-off program was violative of the collective bargaining agreement." Slip. op. at 11 (emphasis in original). We agree.

*Ass'n*, 889 F.2d 599, 604 (5th Cir. 1989). If the arbitrator ignores or refuses to apply a contractual provision that permitted the Company's action, "the arbitrator exceed[s] the express limitations of his contractual mandate." *Bruce Hardwood Floors v. UBC Southern Council of Indus. Workers, Local No. 2713*, 103 F.3d 449, 452 (5th Cir.), *cert. denied*, 118 S. Ct. 329 (1997). Moreover, the Agreement in this case limits the arbitrator to interpreting "the specific terms of this Agreement which are applicable to the particular issue," and to issuing an award that is "not contrary to, and which in no way adds to, subtracts from, or alters the terms of this Agreement." Agreement, Art. X, § 73.

### 1.

The arbitrator concluded that the Company had a duty to bargain with the Union before it instituted the day-off program. This conclusion was grounded in the language of Article I, § 5 of the Agreement:

> The Company recognizes the Union as the exclusive bargaining agent for all production employees, as hereinafter defined, for the purpose of collective bargaining in respect to wages, hours of employment and all other conditions of employment.

Agreement, art. I, § 5. The arbitrator could have rationally inferred from this section that the Company had a duty to bargain over the institution of the day-off program, which, in the arbitrator's words, was used as a "wholesale reduction of the wage bargain." The arbitrator could have reasonably thought that if this section does not create a duty to bargain over wages, hours of

8

employment, and other employment conditions, it would have little or no meaning, given that no other section of the Agreement provides for collective bargaining on these topics.

Moreover, the arbitrator's interpretation of § 5 is consistent with the Company's statutory bargaining obligations. As the arbitrator noted, the National Labor Relations Act creates a duty to bargain with employees over "wages, hours, and other terms and conditions of employment . . . ." 29 U.S.C. § 158(d). In this regard, the Company argues that the arbitrator's award cannot be enforced because it was based on statutory rather than contractual grounds.[3] We disagree. Although the arbitrator's interpretation of the agreement was bolstered by the fact that that interpretation is consistent with the Company's statutory duty, his decision was based on the contract, not on statutory duty. Moreover, the Supreme Court has made clear that although the arbitrator's decision may not be based "'solely upon the arbitrator's view of the requirements of enacted legislation . . . ,'" *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 53, 94 S. Ct. 1011, 1022 (1974)(quoting *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598, 80 S. Ct. 1358, 1361 (1960)), the arbitrator may "look for guidance from many sources . . . so long as [the arbitration award] draws its essence from the collective bargaining

---

[3] The Company also complains that the arbitrator relied on external law in concluding that the Union had not waived its right to rely on § 28 of the Agreement. This complaint does not detain us because the arbitrator ultimately concluded that § 28 did not aid the Union's cause. Thus, even if the arbitrator erred, that error was harmless.

agreement," 363 U.S. at 597, 80 S. Ct. at 1361. The arbitrator's decision in this case drew its essence from the agreement, and the arbitrator properly "look[ed] to 'the law' for help in determining the sense of the agreement." *Id.*

2.

The Company argues that the arbitrator's conclusion that it had a duty to bargain regarding the day-off program ignored Article I, § 7 of the Agreement, which requires the Company to "*meet with* the accredited representatives of the Union for the purpose of settling any disputes which may arise, during the term of this agreement." Agreement, art. I, § 7 (emphasis added). In the previous agreement, which governed from 1990 to January 31, 1994, this section provided that the Company had a duty to "negotiate with" the Union to settle disputes. The Company argues that the arbitrator's finding that the Company had a duty to bargain under § 5 conflicts with § 7, which requires only that the Company "meet with," not that it "negotiate with" the Union to resolve disputes. Section 7 did not expressly preclude the arbitrator from interpreting § 5 to require bargaining over changes to the wage bargain. These provisions can reasonably be read to mean that the company has a duty to bargain over wages, hours of employment, and conditions of employment, but only has a duty to meet with Union representatives over other disputes. To the extent that there is any ambiguity regarding the meaning of these two sections or a

conflict between the two, the arbitrator was entitled to resolve it.

3.

The Company also contends that the arbitrator's decision contravenes the Agreement's management rights clause, which states:

> The management of this Plant and the direction of the working force are reserved and vested exclusively in the Company, except as expressly limited by the written terms of this Agreement.  Such rights of the Company shall include, but are not limited to, the right to . . . schedule and reschedule employees as required by the business needs and operations requirements; to determine the number of employees, jobs, shifts or crews to be utilized in the operation; . . . [and] to establish, eliminate or combine jobs as it deems necessary for efficient operation.

Agreement, art. XVIII, § 104.  The Company argues that the arbitrator's finding that the Company had a duty to bargain with the Union over the day-off program conflicts with this provision.

The arbitrator went to considerable lengths to explain how his conclusion was grounded in the text of the agreement.  The arbitrator specifically addressed the effect of the management rights clause on the parties' dispute and concluded that, although the provision gives management scheduling rights, it does not allow management to exercise those rights "as a vehicle for the wholesale reduction of the wage bargain."  The arbitrator found that the program was not "wage neutral," but "resulted in substantial wage reductions upsetting thereby the wage bargain between the parties."  Further, as the arbitrator observed, the management rights

11

conferred by § 104 are not boundless, but may be "expressly limited by the written terms of [the] Agreement."

Because changes in scheduling will often affect wages, the arbitrator's reading of the management rights clause does cabin the Company's rights under that clause. His reading does not, however, render the clause meaningless. The arbitrator did not conclude that *any* scheduling change would require bargaining, but rather only that the fundamental change brought about by the day-off program, which substantially altered the union's wage bargain, required the Company to bargain with the Union over the program's implementation.

Without question, there is some tension between the arbitrator's construction of § 5 and the management rights clause. To the extent that § 5 and § 104 are in conflict, however, the arbitrator had the authority to resolve this conflict in favor of the Union. The arbitrator did not ignore § 104, but attempted to harmonize that provision with the bargaining requirement he found in § 5. The Company and the Union bargained for the arbitrator's interpretation of the Agreement, not ours. *See Enterprise Wheel*, 363 U.S. at 597, 80 S. Ct. at 1361. Because we cannot say that the arbitrator's decision did not "concern[] the construction of the contract . . . ," we must enforce it. *Id.* at 599, 80 S. Ct. at 1362.

12

4.

Finally, the Company argues that the arbitrator impermissibly based his findings on the parties' past practices (*i.e.*, the 30-year history of the seven-day work week with attendant overtime) in violation of § 104 of the Agreement, which states:

> This agreement contained the full scope of the agreements between the parties and expressly supersedes and cancels any and all provisions written or oral agreements or practices, previous to this agreement.

Although the arbitrator discussed past practices extensively and erroneously stated that past practice is "part of the collective bargaining agreement as though it had been reduced to writing," his decision was ultimately based on his interpretation of the Agreement. He concluded that the seven-day work week is reflected in § 22 of the Agreement, which states that "[t]he work week and payroll week shall be from seven a.m. Monday to seven a.m. the following Monday." The arbitrator described this provision as "coterminous" with prior practice. He also relied on the Agreement's overtime provisions, which provide that employees will receive time and a half on Saturdays and double time on Sundays. In sum, the arbitrator concluded that the parties intended that their Agreement reflect a seven-day work week.

Because we conclude that the arbitrator's decision was based on his interpretation of the contract and supported by practice after the adoption of the Agreement in question,[4] his reference to

_____

[4]    Not only was the seven-day work week in effect before the Company and the Union entered into the January 1994 Agreement, but the practice also continued for nearly seven months after the Agreement was signed. Thus, the arbitrator's construction of the Agreement as reflecting a seven-day work week is consistent not only with prior practice, but also with the seven months of

past practice is not "fatal" to his award, as the Company suggests. Here, there is room in the contract to allow for the reading made by the arbitrator. Thus, even if we were convinced that the arbitrator's understanding of §§ 22 and 23-24 as reflecting a seven-day work week was erroneous or even "seriously erroneous," that would not provide a sufficient basis for refusing to enforce his award. *See Misco*, 484 U.S. at 38, 108 S. Ct. at 371.

## III.

Mindful of our limited role in the review of arbitration awards, we affirm the judgment of the district court enforcing the arbitrator's award.

---

practice under this collective bargaining agreement.