**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**March 6, 2007**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

No. 05-30813

———————————————

RESOLUTION PERFORMANCE PRODUCTS, LLC,

Plaintiff-Appellee,

versus

PAPER ALLIED INDUSTRIAL CHEMICAL AND ENERGY WORKERS INTERNATIONAL
UNION, PACE LOCAL 4-1201 F/K/A NORCO CHEMICAL WORKERS UNION,

Defendants-Appellants.

———————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:04-CV-2324

———————————————

Before HIGGINBOTHAM, DENNIS, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

As part of RPP's purchase of a subsidiary of Shell Oil Company, RPP signed a collective bargaining agreement with the Union, which had had a longstanding relationship with Shell. After the purchase, RPP used only subcontractors, not Union members, for maintenance work, contrary to Shell's past practice. The Union complained that RPP should hire Union members for maintenance work, as Shell had in the past. The arbitrator agreed. The federal district court vacated the award. We reverse and remand.

I

From at least 1950 to 2000, Shell Oil Company owned a

subsidiary named Shell Epoxy Resins.  During that time, Shell and the Norco Chemical Workers Union, later the Paper Allied Industrial Chemical and Energy Workers International Union,[1] had a collective bargaining agreement covering both production workers and maintenance workers.  Over that fifty-year span, the understanding captured in the CBA was enriched by bargaining and several arbitrations.

In 2000, Shell sold the resin subsidiary to Resolution Performance Products, now Hexion Chemical Company.  In the sale agreements, RPP agreed to recognize the Union and adopt the CBA with all past letters of agreement.  RPP did so, adopting a CBA identical in all relevant respects to the Shell-Union CBA.  The CBA stated, in pertinent part and italicized for importance:

<u>Preamble</u>

. . . . *The Company hereby recognizes the Union as the exclusive bargaining representative* of the following collective bargaining unit...[including both production and maintenance workers.]

*This Agreement constitutes the entire agreement between the parties*, and it is agreed that no prior understanding or agreement shall hereafter be operative unless it was reduced to writing and is not in conflict or inconsistent with the terms hereof.

<u>Article III — Classification of Employees</u>
1. Craftsmen [maintenance workers]
. . .
(D) *Nothing herein shall require the Company to adjust or*

---

[1] PACE subsumed NCWU in 2001, succeeding it in all respects.

2

*maintain any given number of craftsmen in any craft.*[2]

### Article XIV — Contractors Rates of Pay
Section 1 - Contractor Performing Work within the Plant
Whenever a contractor or subcontractor performs work within the Plant which could be performed by employees covered by this Agreement, the Company will include a provision in the applicable contract requiring the contractor and subcontractor to pay not less than the rates of pay provided in this Agreement for the same character of work; provided, however, that the foregoing shall not apply if there is an agreement as to rates between the contractor or subcontractor and his employees reached through collective bargaining . . . . [3]

Section 2 - Demotions or Layoffs
RPP's obligations under Section 1 will apply only for the period of time when,
(A) an employee is demoted or displaced from any department or craft listed in Exhibit "A" of the Agreement through no fault of his/her own, whereupon Section 1 will apply on a one-for-one basis to any contractor performing work at the Norco Plant, or
(b) an employee is laid off due to a reduction in force. However, RPP's obligations under Section 1 will continue to apply to any contracted work normally performed by Operators.

After the sale, some production workers transferred to RPP, but no maintenance workers transferred.[4] During the first year of

---

[2] There is no comparable provision under the section governing production workers.

[3] Neither party discusses whether RPP is paying the subcontractors according to these compensation guidelines. *See infra* note 4 and accompanying text (discussing how RPP now uses only subcontractors for maintenance).

[4] According to RPP, Shell and RPP had agreed as part of the deal that Shell would identify before the sale any openings for maintenance workers in the new resin company (how Shell would know this is unclear) or maintenance workers eligible to transfer, but it identified no such openings or workers through its "posting" system. The record on appeal lacks this agreement, although the arbitrator found that, "[a]pparently, Shell wished to retain all of its [maintenance workers]" and "the [maintenance workers] wished to continue to be employed [by Shell]." RPP also alleges that Shell and the Union refused to release maintenance workers for whom RPP had offered jobs; although it cites only briefs, not record evidence, for this allegation, it is consistent with the arbitrator's findings.

RPP's control of the business, all maintenance workers were subcontractors, either employees of various firms, including KBR, or Shell employees subcontracted to RPP under the Interim Labor Services Agreement.[5] At the end of that year, RPP stopped using Shell's workers, who were parties to a Shell-Union CBA; and instead of hiring Union workers, it used as maintenance workers, as it still does, only subcontractors from firms other than Shell, primarily KBR.

The Union asserted in a grievance in 2001 that RPP improperly used subcontractors instead of union workers for maintenance. RPP responded that it would not recognize the grievance because, among other things, it was not timely, the CBA did not require it to employ any maintenance workers, RPP had never employed any maintenance workers and thus could not have subcontracted out the work to the Union's detriment, and Shell maintenance employees had rejected employment with RPP, forcing the company to subcontract out the work. Arbitration followed, and in July 2004 the arbitrator concluded that the grievance was timely and that RPP violated the CBA by subcontracting out all the maintenance work.

The arbitrator began by acknowledging the unique circumstances: while RPP had never employed any Union workers for maintenance, Shell had for fifty years. She then concluded that

---

[5] Shell was a subcontractor because, under the interim services agreement, it retained the right to control its employees, including the right to control hours of work and delegation of assignments.

4

RPP, by assuming the obligations of the CBA and all past letters of agreement, "logically...accepted" the "rich bargaining history" and "past arbitral interpretations of its obligations under the CBA." Hence, she concluded, "the issue should be resolved in the same manner as any other contracting out grievance" — analyzing the text of the CBA and prior arbitral interpretations of that text.

First, she noted that the CBA addressed subcontracting only in Article XIV, which prescribed subcontractor pay. She then stated, "It is generally accepted that a CBA...which is silent about subcontracting...does not give Management the unfettered right to subcontract." She did not mention the applicability of Article III, which grants RPP the right to determine the number of maintenance workers, or discuss the "recognition clause" in the preamble, which the Union argues on appeal is a limitation on the right to subcontract, stating only that the CBA is silent as to RPP's right to subcontract.

Turning then to past arbitral interpretations to inform that silence, the arbitrator analyzed four prior matters, quoting passages showing a desire to protect the integrity of the bargaining unit:

> [Even when subcontracting,] the Company is still obligated to act reasonably and in good faith in such matters, so as not to subvert the labor agreement or to seriously damage the bargaining unit....
>
> ...
>
> Arbitrators are hesitant to permit wholesale subcontracting even where the labor contract is silent

5

regarding such restrictions, if the subcontracting act would significantly undermine the integrity of the bargaining unit or its members rights.

...

[T]he fact that the grievance may create a scheduling difficulty or cost a bit more, does not change the fact that this is bargaining unit work and, as such, cannot be assigned to [ ] contract workers.

...

[Where Shell filled one position with an outside subcontractor,] Shell's decision . . . had absolutely no impact on the scope or integrity of the bargaining unit.

The arbitrator distinguished the instant case from the fourth arbitration, which arose when the last Union member serving as an insulator retired and Shell hired for the waning position one subcontractor, instead of a Union member. She noted that the current case is about the entire maintenance unit, not just one position, and that there is plenty of maintenance work for the unit here, unlike the prior arbitration where there was not even one daily full-time job for an insulator. She observed that the arbitrator in the prior arbitration sensibly read the CBA not to force Shell to maintain obsolete positions.

The arbitrator here found the lesson from past arbitrations clear: though the company has some latitude to subcontract, it cannot do so if subcontracting would significantly undermine the integrity of the bargaining unit. Because RPP did not employ any bargaining unit maintenance employees but instead subcontracted out all the maintenance work, the arbitrator concluded that RPP had

6

undermined the integrity of the bargaining unit.

Finally, as the remedy, the arbitrator ordered that

> the Company shall employ maintenance craft employees in numbers comparable to that of the Epoxy Resins Department when it was owned by Shell. Bargaining unit maintenance employees shall be responsible for routine maintenance of the plant. The Company may allocate work in the manner comparable to Shell's practices relating to employment and contracting out, before the sale.

RPP filed suit in federal district court, seeking vacatur of the award, and both parties moved for summary judgment. The district court granted RPP's motion. Although the court deferred to the arbitrator's conclusion that the grievance was timely, it concluded that the arbitrator erred by considering past practice where the CBA stated it was the entire agreement between the parties and erred under *Beaird Industries, Inc. v. Local Union 2297 International Union*,[6] which directs vacatur where the arbitrator acts contrary to an express provision of the CBA, because Article III of the CBA unambiguously did not require RPP to maintain a fixed number of maintenance workers. The Union appealed.

II

We review the district court's grant of summary judgment *de novo*.[7] Judicial review of arbitration decisions arising from the terms of a CBA is "narrowly limited," and courts should afford

---

[6] 404 F.3d 942, 944 (5th Cir. 2005).

[7] *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 762 (5th Cir. 2001).

7

"great deference" to arbitration awards.[8]  "As long as the arbitrator's decision 'draws its essence from the collective bargaining agreement' and the arbitrator is not fashioning 'his own brand of industrial justice,' the award cannot be set aside."[9] Additionally, "a court must affirm an arbitral award 'as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority.'"[10]  Even where a court would have interpreted the contract differently, a court must still affirm the award.[11]  However, under *Beaird*, an arbitrator lacks authority to render a decision contrary to an unambiguous provision of the CBA.[12]

### III

The Union argues that the award drew its essence from the CBA because the CBA does not unambiguously permit RPP to subcontract, especially in the face of the preamble's "recognition clause," which recognizes the Union as the exclusive bargaining agent for

---

[8] *Beaird*, 404 F.3d at 944.

[9] *Weber Aircraft Inc. v. Gen. Warehousemen & Helpers Union Local 767*, 253 F.3d 821, 824 (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)).

[10] *Beaird*, 404 F.3d at 944 (quoting *Misco,* 484 U.S. at 38).

[11] *Id.*

[12] *Id.* at 946–47.  *See also Houston Lighting & Power Co. v. Int'l Bhd. of Elec. Workers, Local Union No. 66*, 71 F.3d 179, 182 (5th Cir. 1995) ("The 'rule in this circuit, and the emerging trend among other courts of appeals, is that arbitral action contrary to express contractual provisions will not be respected.'") (quoting *Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n*, 889 F.2d 599, 604 (5th Cir. 1989)).

the class of maintenance workers.  For this proposition it cites three cases, which it also contends are more relevant than *Beaird*.

In *Folger Coffee Co. v. Int'l Union*,[13] the arbitrator sustained the union's challenge to the company's use of subcontractors, concluding that, despite language in the CBA permitting the company to subcontract, the right to subcontract was not absolute.  In so concluding, the arbitrator relied in part on the past practice of union members performing the work of subcontractors and in part on a CBA provision stating that the CBA's purpose was to strengthen the parties' relationship.  This court affirmed, concluding that reliance on past practice was permissible where the agreement was silent or insufficient to enable the arbitrator to render a decision and that the arbitrator's interpretation of the "purpose" clause as a limitation on the right to subcontract was reasonable because, unless the agreement contained an explicit clause entitling the company to subcontract regardless of the effect on the bargaining unit, subcontracting should be balanced against the rights of the union.

In *National Gypsum Co. v. Oil, Chemical, and Atomic Workers International Union*,[14] the arbitrator concluded that, although the CBA included a management rights clause permitting the company to "schedule and reschedule employees as required by the business

---

[13] 905 F.2d 108 (5th Cir. 1990).

[14] 147 F.3d 399 (5th Cir. 1998).

9

needs" of the company, the company had to bargain before reducing the work week from seven to six days. The arbitrator reasoned in part that the recognition clause recognized the Union as the exclusive bargaining agent. In so concluding, the arbitrator relied in part on past practice, even though the agreement explicitly stated that it constituted the "full scope" of the agreement between the parties. This court affirmed, concluding that the arbitrator, whose province it was to resolve conflict between CBA provisions, had made a reasonable interpretation; it evinced concern about the use of past practice given the "full scope" clause, but because the decision was otherwise grounded in the CBA, the inquiry into past practice was not "fatal."

In *NCR Corp. v. International Association of Machinists and Aerospace Workers*,[15] the arbitrator interpreted the recognition clause as a limitation on the management's right-to-subcontract clause in sustaining the union's challenge to the company's use of subcontractors. In so concluding, the arbitrator also looked to past practice. The Tenth Circuit reversed the district court's vacatur, emphasizing the deferential standard of review and affirming the use of past practice.

In *Beaird*, the arbitrator sustained the union's grievance challenging company subcontracting. The district court vacated the award. This court affirmed, determining that the CBA provision

---

[15] 906 F.2d 1499 (10th Cir. 1990).

10

defining the company's right to subcontract was unambiguous: "'[T]he Company has and retains and the Union recognizes the sole and exclusive right of the Company to exercise all the rights or functions of management . . . [including] the decision to subcontract out work . . . .'" We concluded that, because no other provision of the CBA limited this right, the arbitrator failed to draw his conclusion from the essence of the agreement by acting contrary to an express CBA provision.[16] We distinguished *Folger* on the ground that the CBA in *Beaird* was explicit in permitting subcontracting and contained no limitation on subcontracting; we also called *Folger*'s holding the "outer limits" of deference to arbitral awards.

The Union claims that *Beaird* is not on point because the Union's CBA does not contain an unambiguous "management rights" clause reserving to RPP the right to subcontract, and because its CBA contains a recognition clause recognizing the Union as the exclusive bargaining agent for the maintenance workers.

RPP counters that Article III unambiguously allows it not to maintain maintenance workers, conflicting head-on with the arbitrator's award that RPP "shall employ maintenance [workers] in numbers comparable to that of the [] Department when it was owned by Shell...." It also contends that the arbitrator pointed to no CBA provision which RPP violated.

---

[16] 404 F.3d at 944-47.

11

We conclude that the arbitrator's award "drew its essence" from the CBA. First, we put aside one area of contention. There is a powerful argument that RPP, by explicitly assuming the Shell-Union CBA and all prior letters of agreement, assumed the prior arbitral interpretations of the CBA. The argument is that those interpretations did more than fill interstices and provide needed gloss to unclear provisions, the results of which must be controlling now; they also framed the background against which the parties understood the terms of negotiation. RPP contends that the arbitral history is irrelevant.

The arbitrator here did consider past interpretations, but only after concluding that the CBA was ambiguous as to subcontracting. If the CBA did not unambiguously confer a right to subcontract, then the arbitrator's task was to construe an ambiguous CBA, and mere disagreement with the performance of that task is not alone a basis for vacating the award.[17] Relatedly, the role the past arbitral decisions played is not wholly clear. At one point, after finding the CBA ambiguous, the arbitrator appeared to construe the CBA *de novo*, without reference to any prior arbitration: "It is generally accepted that a CBA...which is silent about subcontracting...does not give Management the unfettered right to subcontract." That is, she seemingly decided how to

---

[17] *Beaird*, 404 F.3d at 944 (quoting *Misco,* 484 U.S. at 38).

12

construe this CBA as a matter of first impression.[18]  Regardless, the question for us is whether the CBA unambiguously gave RPP the right to subcontract.  We conclude that it did not.

That the CBA did not unambiguously give RPP the right to subcontract is apparent.  At the very least, that conclusion is defensible and, therefore, we must defer to it.  Most importantly, the CBA is silent as to RPP's right to subcontract,[19] and the CBA recognizes the Union as the representative of maintenance workers, suggesting that RPP cannot subcontract all maintenance work.[20] There was no recognition clause in *Beaird*, and the CBA there included a "management rights" clause expressly reserving to management the right to subcontract, absent here.  Our result accords with *Folger Coffee Co. v. International Union*, where the

---

[18] Her use of the term "generally accepted" suggests reliance on prior legal interpretations of similar contracts, but that is different from reliance on precedential interpretations of the CBA at issue.  After all, all judges when interpreting contracts, even in the first instance, use rules and maxims derived from other cases.

[19] Subcontracting is mentioned once, but only in the section requiring any subcontractors to be paid at certain rates.

[20] In *NCR Corp.*, 906 F.2d at 1505-06, the Tenth Circuit construed a recognition clause as a limitation on an express right-to-subcontract clause. This goes even further than we do since the CBA here contains no express right-to-subcontract clause.

At oral argument, RPP contended that we cannot rely on the recognition clause because the arbitrator did not rely on it in her analysis.  This mistakes the nature of our review of arbitral awards, which we review *in toto* only to determine whether they draw their "essence" from the CBA.  After all, arbitrators need not, and sometimes do not, attach any reasoning to their awards, and we do not by virtue of that fact vacate such awards.  *See Sarofim v. Trust Company of the West*, 440 F.3d 213, 218 (5th Cir. 2006).  Moreover, we can affirm a federal district court's judgment on grounds presented by the parties but not relied on by the court, *see Brown v. Nationsbank Corp.*, 188 F.3d 579, 586 (5th Cir. 1999); certainly our review of arbitral awards is no less deferential.  In short, we can and should uphold an award on any reasonable ground.  *See Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 385 (5th Cir. 2004).

13

CBA explicitly gave management the right to subcontract, absent here, but that clause was contradicted by others.[21]  In sum, the CBA here did not speak in unambiguous terms about subcontracting. Because the CBA was ambiguous about RPP's right to subcontract, we must defer to the arbitrator's interpretation, which draws its essence from the CBA, that the CBA does not permit wholesale subcontracting.[22]

RPP's best argument, that advanced by the district court, is that Article III unambiguously gives RPP a right to subcontract by stating that RPP has no obligation to maintain any specific number of maintenance workers.  Article III, of course, makes no mention of subcontracting.  Rather, both RPP and the district court focus on the wording in the arbitrator's award that "the Company shall employ maintenance...employees in numbers comparable to that of the Epoxy Resins Department when it was owned by Shell."  Just one or two pages before that statement, however, the arbitrator stated that "the CBA cannot mandate that a job classification remain filled if there is inadequate work" due to modernization, a changing market, or similar business reasons.  That is, she

---

[21] 905 F.2d at 109.  *Beaird* distinguished *Folger* precisely because the CBA in *Beaird* had the explicit management rights clause and no contradictory clauses, again highlighting the lack of such an explicit clause here.  404 F.3d at 945-46.

[22] Contrary to RPP's assertion, the arbitrator need not have pointed to a specific, explicit CBA provision that RPP violated.  The CBA was ambiguous about subcontracting; the arbitrator reasonably interpreted that ambiguity to preclude wholesale subcontracting, thus RPP violated the CBA.  Our holdings in *Folger* and *Beaird*, and traditional principles of contract interpretation, do not require violation of a specific, explicit provision.

14

acknowledged that the CBA does not mandate that RPP maintain positions it wants to eliminate, as the Union conceded at oral argument.[23] Reading the "award" as not just the final section entitled "award" but rather the entire document,[24] we see ambiguity in the award stemming from these two statements. Put another way, with this dispute, drawn as it is over the right of RPP to subcontract, we do not read the arbitrator's remedy as unambiguously imposing the obligation to engage unneeded workers. That reading is defied by the circumstance that the issue in dispute is subcontracting or not, as the arbitrator herself made clear in dispensing with the idea that RPP would have to employ a certain number of workers. The critical element in the remedy is the obligation to "employ," that is "not subcontract," not the phrase "in numbers comparable." In context, it is not unreasonable to read the award as ordering that *to the extent that* RPP chooses to use routine maintenance workers, it must meet that need as its predecessor did by employing Union workers, not by wholesale

---

[23] Again, we need not decide the appropriate precedential effect of prior arbitral decisions. In addressing the prior arbitrations, the arbitrator confirmed her own view that the company cannot be made to retain a certain number of positions in the face of certain circumstances: "As Arbitrator Fox correctly observed, the CBA cannot mandate...." The relevant point is that the conflict arises from her own statements, the precedential force of prior arbitrations aside.

[24] *See, e.g., Cannelton Indus., Inc. v. Dist. 17, United Mine Workers of Am.*, 951 F.2d 591, 594 (4th Cir. 1991) (explaining that courts sometimes look to an arbitrator's reasoning in determining whether the award draws its essence from the CBA).

subcontracting.[25]

In sum, the CBA did not clearly allow RPP to subcontract out the maintenance work. The arbitrator resolved the dispute over this uncertainty by precluding subcontracting, a resolution we cannot fault, footed as it is in the terms of the contract.

IV

RPP presses an alternative ground for affirmance,[26] that the arbitrator, whose action on this point was affirmed by the district court, improperly found the grievance arbitrable. Namely, RPP contends that the arbitrator ignored the plain language of the CBA requiring the party requesting arbitration, the Union, to apply for a panel of arbitrators within thirty days of requesting arbitration.[27]

Although the Union waited more than thirty days to apply for a panel of arbitrators, the district court explained that

> [t]he arbitrator found the matter arbitrable after reviewing correspondence between the parties' counsel regarding the original grievances and the Union's desire to proceed to arbitration....The Arbitrator...concluded

---

[25] RPP suggested at oral argument that maintenance workers might become obsolete. About that we say only that RPP is not obligated to use any workers to do maintenance.

[26] The Union incorrectly argues that RPP has forfeited this issue by failing to cross-appeal it. We may affirm a lower court's grant of summary judgment on a ground not relied upon (or rejected) by that court as long as the movant below asserted the ground, *see Black v. North Panola School District*, 461 F.3d 584, 593 (5th Cir. 2006); hence before us now is the propriety of the entire order of summary judgment.

[27] RPP also argued in front of the arbitrator and the district court that the underlying grievances were not timely filed, but it abandons this argument on appeal.

16

the delay in proceeding to arbitration was a result of RPP counsel's failure to correspond with the Union in a timely fashion.[28]

On appeal, RPP argues that the arbitrator's focus on the correspondence improperly contradicts the plain meaning of the CBA. In other words, RPP contends that the Union should have requested a panel within thirty days, regardless of any dilatory tactics or obstruction, intentional or not, on RPP's part.

We are unwilling to say that the arbitrator's conclusion did not "draw[] its essence from the collective bargaining agreement" and that the arbitrator was not "even arguably construing or applying the contract and acting within the scope of h[er] authority."[29] The CBA's prescribed arbitration procedures are necessarily somewhat flexible, and the CBA sustains the interpretation that a party cannot obstruct the procedures and then benefit from that obstruction. And we do not second-guess the arbitrator's factual finding that RPP's counsel's correspondence led to the delay.

We REVERSE the district court's judgment and REMAND for proceedings consistent with this opinion.

---

[28] The arbitrator also concluded that the CBA, by stating that the party seeking arbitration "may" apply for a panel of arbitrators within thirty days, did not *require* the Union to act within thirty days. We do not address this issue.

[29] *Misco*, 484 U.S. at 38.